# EXHIBIT 3
# Part 3 of 3

FF'S DEPARTMENT
County of San Bernardino
California
CA 03600

1389000-09

REPORT AREA

E THREE

| SECTION | CRIME | CLASSIFICATION |
|---|---|---|
| 187 | MURDER | |

| IM'S NAME — LAST NAME | FIRST NAME | MIDDLE NAME | (FIRM NAME IF BUSINESS) |
|---|---|---|---|
| NE, NHUNG, MY | | | |

| ESS | ☐ RESIDENCE   ☐ BUSINESS | PHONE ( ) |
|---|---|---|

## ERVIEW WITH JEFF BRINKMAN CRANE:

his best friend and began a relationship with him.  Approximately two to three months after beginning this relationship he moved in with her.  He was aware that she was married but later she was considering a divorce from her husband, she had told him how her husband had physically and mentally abused her since their marriage and that their relationship has been poor since 1981.  He also told me that she filled out papers for divorce contacting her attorney in Yucca Valley by the name of Phil Flickinger. mr. CRANE was present when she did this and had assisted her over a several month period in filling out the papers and filing them with the court.  He told me that he was very much in love with her, wanted her to get a divorce, he wanted to live with her.  I asked him if she had notified her husband while he was overseas that she had planned to divorce him.  He told me YES, prior to his return home  they had spoke on the telephone, he had listened to her part of the conversation.  She had told him that she had filled out papers for a divorce and after the conversation was over with Mrs. BOONE told CRANE what her husband's reply was to the idea of divorce.  Mr. BOONE had stated to Mrs. BOONE, YOU'RE FULL OF SHIT, SHUT UP and that was his answer to her watning the divorce.

Mr. CRANE was asked if Mrs. BOONE had told her hsuband about him.  He told me NO, that they were going to wait until he was served with all the paperwork from the divorce. He was to return hom on the 30th of April but unexpectedly came home on the 18th of April.  On Friday the 18th, Mr. CRANE tells me that he was going to take the victim and the children to dinner at Denneys but first he had to go to a sporting event on the base.  He got to the house at approximately 2115 hours and was there for ten to 15 minutes talking with Mrs. BOONE in the living room.  Mrs. BOONE had on a robe and all of a sudden Mr. BOONE walked in.  Mr. CRANE tells me that Mr. BOONE immediately came over and struck him, that they began fighting and Mr. CRANE stated to him WHAT'S YOUR PROBLEM ASSHOLE, WHO ARE YOU.  Mr. BOONE replied, I'M HER HUSBAND.  They fought for awhile and then stopped, Mr. CRANE stated that she filed for divorce, Mr. BOONE wanted his I.D. card.  At first he wouldn't give it to him, Mr. BOONE went outside to get his license plate and military tag number off his motorcycle that he was going to call PMO and then call the Sheriff's Office.  Mr. CRANE did not want to leave he said he was concerned for Mrs. BOONE but he knew that there was a shotgun  in the house and he was afraid that things would get out of hand.  He then went down the street to a friends house, named BONNIE STONE.

Mr. CRANE told me he became concerned, felt that she might get hurt, had BONNIE call the Sheriff's Office and report the disturbance.  He then went back down there waiting their arrival to see that she waas alright.  Mr. CRANE told me that the suspect

| OTING OFFICERS | DATE | REVIEWED BY | TYPED BY | ROUTED BY | DATE |
|---|---|---|---|---|---|
| . MULLENS, DET., M-3330 | | | RM 5-16-86 | | |

| THER ACTION: | COPIES TO: | | | REMARKS |
|---|---|---|---|---|
| ☐ YES   ☐ NO | ☐ Detective   ☐ Dist. Atty. | ☐ SO/PD   ☐ CII   ☐ Patrol | ☐ Other   ☐ Other | (93) |

184-401 Rev. 1/83

FF'S DEPARTMENT

County of San Bernardino
California

CA 03600

| | | | | |
|---|---|---|---|---|
| | | | | 1389000-09 |
| | | | | REPORT AREA |

E FOUR

| E SECTION | CRIME | CLASSIFICATION |
|---|---|---|
| 187 | MURDER | |

| TIM'S NAME — LAST NAME | | FIRST NAME | | MIDDLE NAME | (FIRM NAME IF BUSINESS) |
|---|---|---|---|---|---|
| NE, NHUNG MY | | | | | |

| RESS | | RESIDENCE | BUSINESS | | PHONE ( ) |
|---|---|---|---|---|---|

**ERVIEW WITH JEFF BRINKMAN CRANE:**  (Continued)

stayed at the house and did not heaar from the victim until Saturday night when she and the children were thrown out of the house by the suspect.  He learned from Mrs. BOONE that the suspect had made a staement to her saying GET OUT OR I'LL KILL YOU. Mrs. BOONE went to a motel, he then began assisting her in getting a restraining order against her husband, that he spent alot of time going to San Bernardino to get this restrainging order filed, get a proof of service.  On WEdnesday the 23rd of April after obtaining paperwork she needed he went looking for her.  She could not be found, he contacted her friend PHONG FLORES, learned that she was aT Luckie Park.  He went down to Luckie Park and before making contact with her saw that she was with her husband that that her husband's arm was around her.  He then told me that he didn't want to see her, that he was very angry, upset and jealous and all the work he had gone through to help her get the restraining order and she was not staying away from her husband and he thought they were in love so he then wrote a letter to the husband but it was not delivered.  In the letter he told about Mrs. BOONE having a relationship wtih five other men while married to the victim.  He told him about the sexual relationship they had, named the persons.

He told me he also had the letter delivered to his Company Commander, BOONE's, one copy sent to Mrs. BOONE's attorney and was going to give a copy to the Sheriff's Office.  Later in the evening he made contact with Mrs. BOONE at her residence to tell her about the letter.  She was upset, there was some crying.  When he was trying to leave in the car she jumped on his lap and wouldn't get out of the car, he then ended up driving her over to his house where they had a long talk.  He told me that they finally got the restraining order signed, there was a problem with the date, he said that the Sheriff's Office did not serve it at first.  It was finally served but Mrs. BOONE continued to have contact with Mr. BOONE, this upset him very much.  They had arguments over it, he insisted her not to see Mr. BOONE until the hearing in regards to the restraining on the 13th of May.  She told him that she wanted to give him a chance, referring to Mr. BOONE, to discuss their problem.  This continued to upset Mr. CRANE very much.  At time he would try to contact the house to talk with her, Mr. BOONE would answer the phone and tell him to not call there no more, that Mrs. BOONE did not want to speak to him, she had no further desire to have contact with him.

Mr. CRANE would get upset and he would contact Mrs. BOONE and find out that was not what she said but she still continued to have contact with her husband which bothered Mr. CRANE.  Mr. CRANE told me the next time he had contact with her was on 4-27-86 Sunday.  He had left for the weekend for a sales meeting in Phoenix, Arizona.  he sells vacuum cleaners part time.  He tried to get a hold of her on the phone when he first

| RTING OFFICERS | DATE | REVIEWED BY | TYPED BY | ROUTED BY | DATE |
|---|---|---|---|---|---|
| L. MULLENS, DET., M-3330 | | | RM 5-17-86 | | |

| THER ACTION: | COPIES TO: | | | REMARKS |
|---|---|---|---|---|
| YES   NO | Detective   Dist. Atty. | SD/PD   CII   Patrol | Other   Other | |

5184-401 Rev. 1/83

94

S' **FF'S DEPARTMENT**

**County of San Bernardino**

**California** ·

**CA 03600**

| 1389000-09 |
| --- |
| REPORT AREA |

| FIVE | | | |
| --- | --- | --- | --- |
| SECTION | CRIME | CLASSIFICATION | |
| .87 | MURDER | | |
| M'S NAME — LAST NAME | FIRST NAME | MIDDLE NAME | (FIRM NAME IF BUSINESS) |
| E, NHUNG MY | | | |
| :ESS | RESIDENCE | BUSINESS | PHONE ( ) |

:RVIEW WITH JEFF BRINKMAN CRANE:   (Continued)

returned and was unable to. He then drove by the residence, saw Mrs. BOONE and Mr. BOONE sitting outside. They were approximately apart, they were sitting on some rocks out in front of the house. This upset Mr. CRANE very much that she was again having contact with him, apparently on her own free will. He then went and called the Sheriff's Office and requested a unit to come by the BOONE residence because Mr. BOONE was in violation of the restraining order. He told me that before the Sheriff's Unit could arrive, BOONE had left. Mr. CRANE was waiting down on the highway by Smoke Tree Auto Parts. Mr. BOONE saw him, Mr. CRANE went inside the auto shop business to avoid contact, further problems. Mr. BOONE finally left. He was later able to get a hold of Mrs. BOONE and she told him that they were discussing their problems, that she would be careful, that she knew when it was safe to be around him and when it was not safe to be around him. At this time she said it was safe to be around him, Mr. BOONE. This was Monday or Tuesday, April 28 or 29.

He pretty much was going to leave it up to her to deal with him because he was upset with the way it was being handled. At one time he contacted Mr. BOONE and told him that he loved his wife and that he wanted to get this matter settled between all of them. He was told by Mr. BOONE not to contact his wife, to leave her alone, they would work things out. Mr. CRANE was afraid that possibly they had because she was permitting him to come around. He called her on Wednesday, 4-30-86, and Mr. BOONE had still not moved out of the residence. Mr. CRANE then decided that he would let VELVET, the victim, handle it and he wouuld go back to New York for a visit with his mother because he was very uspet about this and he needed some time away to think. He got a hold of Mrs. BOONE and told her this, that he needed to get away and think about it. He left the Palm Springs airport 5-1-86 at 0750 hours and flew back to New York. After arriving back in New York he did have several telephone conversations with the victim and with the suspect. His first contact at the house in 29 Palms he spoke with suspect DONALD BOONE. He was told that she didn't want to speak with him and for him to mind his own business. He tells me this was early morning hours 0100 on 5-2-86 and possibly on 5-3-86.

He was able to contact the victim on 5-3-86 at 9:00 in the morning California time. She was at work when he called her. He wanted to see if what he was told by Mr. BOONE was in fact true, that Mrs. BOONE didn't want to see Mr. CRANE anymore just in case they had made up. Mrs. BOONE told him that nothing had changed, that everything was alright between them, that she would call DONALD BOONE up and find out what is going one. Later at 1430 hours on the same date, CRANE told me that he again called Mrs. BOONE at work, she told CRANE that everything had been straightened. CRANE also

| RTING OFFICERS | DATE | REVIEWED BY | TYPED BY | ROUTED BY | DATE |
| --- | --- | --- | --- | --- | --- |
| MULLENS, DET., M-3330 | | | RM 5-17-86 | | |

| HER ACTION: | COPIES TO: | | | REMARKS |
| --- | --- | --- | --- | --- |
| ☐ YES  ☐ NO | ☐ Detective  ☐ Dist. Atty. | ☐ SD/PD  ☐ CII  ☐ Patrol | ☐ Other  ☐ Other | (95) |

184-401 Rev. 1/83

S⊙FF'S DEPARTMENT
County of San Bernardino
California

CA 03600

1389000-09
REPORT AREA

| SIX | | |
|---|---|---|
| SECTION | CRIME | CLASSIFICATION |
| 87 | MURDER | |

M'S NAME — LAST NAME          FIRST NAME          MIDDLE NAME     (FIRM NAME IF BUSINESS)

E, NHUNG MY

ESS          ☐ RESIDENCE     ☐ BUSINESS          PHONE
( )

## RVIEW WITH JEFF BRINKMAN CRANE:  (Continued)

told me that he had asked her in the phone conversation, either in the morning or in
the afternoon, where she had been Friday night since he had answered the phone. She
told him that she was at TONY's house at a makeup party and then decided to stay the
night at TONY's house when in actuality he learned later that she had been over at
Mrs. FLORES's house with her husband and that she waas at her house when he called
eary in the morning. He told Mrs. BOONE that he was going to stay in New York until
after the hearing in regards to the restraining order. Mrs. BOONE requested that
CRANE come back from New York early and get a motel room in Palm Springs and they
would meet there. They agreed on this and he told Mrs. BOONE he would call her the
next morning, referring to Sunday. When he called her there was no answer, he then
contacted Mrs. FLORES and learned that Mrs. BOONE had been shot to death. Mr. CRANE
said he had the letter at his residence, the one he wrote about Mrs. BOONE's past
affairs, he agreed to get the letter for me so I could have a copy. He again told
me he wrote the letter because he was very upset and jealous and thought maybe she
had betrayed him and this was his way of getting even with her. We also discussed
if he had seen any firearms at the victim's residence, he told me YES that he had
seen a shotgun. The shotgun was in a case in Mrs. BOONE's bedroom in a closet. He
had seen it one time when he was putting some of his clothes in the closet. He was
told it belonged to Mr. BOONE. He recognized it as being a .12 guage, stating he
was somewhat familiar with shotguns.

He had told me that he had learned from a Mrs. STONE that one time HEATHER saw Mr.
BOONE pull the shotgun out on Saturday morning and HEATHER had tried to hide it but
was unable to carry it because it was too big for her. Mr. CRANE tells me he is
attempting to get out of the Marine Corps, he's had a heart attack back in 1985 while
in the Marine Corps, he's also had some nervous breakdowns which he attributes to Mrs.
BOONE, having had some problems with her in the past where she used to go out with
her friends. One time he was so upset he had to go to the hospital becuase he was
in convulsions. He also told me that when he learned of the shooting, he had to see
a psychiatrist because he was very upset about the shooting. He did not want to come
home from New York but the Marine Corps told him that his leave had been cancelled and
he would have to get back. He provided me with his mother's name and address in
New York, KATHLEEN CRANE, P.O. BOX 209, Las Nova, New York, 315-852-6203. Mr. CRANE
had no further information.

## ITIONAL INFORMATION/OFFICER:

On 5-15-86 I went to CRNAE's residence at 6161 Ocotillo #8, 29 Palms. Recovered from

| RTING OFFICERS | DATE | REVIEWED BY | TYPED BY | ROUTED BY | DATE |
|---|---|---|---|---|---|
| . MULLENDS, DET., M-3330 | | | RM 5-17-86 | | |

HER ACTION:          COPIES TO:          ☐ SD/PD     ☐ Other          REMARKS

YES  ☐ NO          ☐ Detective     ☐ CII     ☐ Other

☐ Dist. Atty.     ☐ Patrol

184-401 Rev. 1/83

SH...FF'S DEPARTMENT

County of San Bernardino
California

CA 03600

| | 1389000-09 |
|---|---|
| | REPORT AREA |

SEVEN

| SECTION | CRIME | CLASSIFICATION | |
|---|---|---|---|
| 87 | MURDER | | |

| M'S NAME — LAST NAME | FIRST NAME | MIDDLE NAME | (FIRM NAME IF BUSINESS) |
|---|---|---|---|
| E, NHUNG MY | | | |

| ESS | ☐ RESIDENCE | ☐ BUSINESS | PHONE ( ) |
|---|---|---|---|

TIONAL INFORMATION/OFFICER:   (Continued)

that residence was a letter.  The letter was dated 4-29-86 and was addressed to
Staff Sergeant BOONE.  In the letter Mr. CRANE wrote about his relationship with the
victim, personal sexual acts committed between them.  He also named other persons
who he states had personal relationships with the victim.  He names his best friend,
SEAN CROCKER a Lance Corporal, he talked about her husband before DONALD BOONE, a
RONALD FULLEN, he also spoke about some persons who belonged to the same unit as the
suspect did when he was in 29 Palms prior to going over seas, a Staff Sergeant STEVE
WOLFIELD of 3rd tanks,  a Lt. LIONS also fo 3rd tanks, a Lance Corporal DAVE unkown
last name who had an affair with her prior to Mr. BOONE going over seas to Japan.
The letter also spoke of a relationship between an ex-commissary boss at the base
and named another person named Mr. MOORE.  The letter was  signed by Lance Corporal
JEFF CRANE, D company 3rd AAV Battalion.  The original was retained as evidence,
a copy was given to Mr. CRANE.  The original will be⅂ forwarded to the Homicide
Devision.

'OSITION:

Case cleared by arrest.

| RTING OFFICERS | | DATE | REVIEWED BY | TYPED BY | ROUTED BY | DATE |
|---|---|---|---|---|---|---|
| MULLNES, DET., M-3330 | | | | RM 5-17-86 | | |

| HER ACTION: | COPIES TO: | ☐ SD/PD | ☐ Other | REMARKS | |
|---|---|---|---|---|---|
| YES ☐ NO | ☐ Detective | ☐ CII | ☐ Other | | |
| 84-401 Rev. 1/83 | ☐ Dist. Atty. | ☐ Patrol | | | |



PLAINTIFF'S
EXHIBIT
# 3



**IRVING ROOT, M.D., INC.**
Anatomic, Clinical and Forensic Pathology
407 E. Gilbert Street
Suite 7
San Bernardino, California 92404
(714) 888 2246

**Autopsy Protocol**

Number: A-588-86

Name:           Nhung My Boone          Age: 40 Sex: Female   Race: Oriental
Time of Death:  Reported Found 1617 hours May 3, 1986
Time of Autopsy:              1325 hours May 5, 1986
Place of Autopsy: County Morgue, San Bernardino          Deputy: Colella

HISTORY OF DEATH: The history as obtained from the investigating officer, is that between 1540-1600 hours on May 3, 1986, the subject's husband shot her with a 12 gauge shotgun. The subject's husband called neighbors and then shot himself superficially with the shotgun. When the neighbors arrived at 1617 hours, the subject was found dead on the sofa.

EXTERNAL EXAMINATION: The body is a well-developed, well-nourished Oriental female appearing the listed age of 40. The height is 61", the weight is 114 lbs., the hair is brown, the eyes are brown, the complexion is medium.

The body is dressed in a gray pullover T-shirt with Oriental writing on the front, a beige bra and blue jeans. The blue jeans zipper is zipped up and the top button is buttoned. She has yellow metal looped earrings and two stud earrings on each side. She has two yellow metal necklaces on. One of the necklaces has a charm which says "14 K Gold". The other has a pendant with a clear stone. A watch with a black band is present on the right wrist. There are seven yellow metal bracelets on the left wrist and a green and red stone bracelet on the left wrist. The fourth finger of the right hand has a yellow metal ring composed of seven separate rings and a woven patterned yellow metal ring. The left ankle has a yellow metal bracelet.

The head is normally formed, atraumatic. The conjunctivae are pale. The corneae are slightly clouded. There is a small amount of blood present in the right naris. The lips and gums are unremarkable. There is a partial upper plate including the incisors. The teeth are otherwise are natural and in fair repair. The neck is normally formed.

There are shotgun wounds of the lower chest which will be described below. The chest is otherwise normally formed. The breasts are without masses. The abdomen is flat. There is a horizontal 4 cm. fine line suprapubic scar. The external genitalia are normal adult female. There are no injuries to the labia, perineum or introitus.

The dorsal surface of the right forearm has a vertically oriented 3 cm. fine line scar. The upper extremities are otherwise unremarkable.

The proximal anterior right thigh has a 2.5 cm. horizontally oriented fine line scar. There are scattered fine line scars about the anterior right knee up to 1 cm. in length.

BOONE AUTOPSY CONTINUED
PAGE 2
A-588-86

The lateral aspect of the mid right thigh has a few pale blue ecchymoses up to 1 cm. in diameter.

The anterior left knee has a few irregular scars up to 1 cm. in diameter. The medial aspect of the mid leg has a 6.5 cm. pale blue-green to yellow-tan ecchymosis.

The back has violaceous pink, fixed livor mortis, except for areas of pressure demarcation. Rigor is present and well-fixed.

SHOTGUN WOUNDS: There are two penetrating shotgun wounds on the anterior chest wall, numbered on the accompanying diagram for reference purposes only.

Wound #1 is located on the left anterior chest wall, centered 2.5 cm. below the internipple line and 2.5 cm. to the left of the midline. This is centered 45" above the level of the heel. The wound is irregular, almost square, 3 cm. x 3 cm. The edges are scalloped and slightly dried.

Wound #2 is located directly below wound #1, with an intervening 1.5 cm. strip of intact skin. It is centered 43 1/2" above the level of the heel. The wound is circular, 3 cm. x 3 cm., with a slightly scalloped edge. There is a superficial abrasion extending from the 4 o'clock to 7 o'clock position for a distance of 8 mm.

There are corresponding defects in the shirt and bra, with the defect corresponding to wound #1 passing through the left top of the bra and the upper portion of the other defect, just nicking the lower portion of the bra.

The chest surrounding the wounds is asymmetric and sunken.

Wound #1 passes through the 3rd intercostal space and extensively fracturing the anterior portion of the costal cartilage of the 4th and 5th ribs. The second wound passes directly beneath this through the junction of the 6th through 9th costal cartilage with the sternum. The wounds are directed upwardly approximately 30 degrees and very slightly from right to left. The heart, descending thoracic aorta and left lung are extensively macerated. There is approximately 1500 cc. of blood and tissue fragments in the left chest cavity.

The pellet tracks then pass through the posterior chest wall, extensively fracturing the posterior aspect of the 2nd through 10th ribs. There are numerous circular, approximately 3 mm. defects on the lateral posterior chest wall and on the left aspect of the vertebral column adjacent to the rib fractures. There is a moderate amount of hemorrhage associated with these in the soft tissue. There are numerous dull gray metallic pellets embedded in the soft tissue of the posterior left chest wall. These are approximately 3 mm. in diameter. Most are deformed. The chest cavity contains two plastic shotgun cups with cross diameters at the base approximately 18 mm. One has lacerations with some embedded shotgun pellets in the base. The wadding and sample of the pellets are submitted to the San Bernardino Crime Lab.

A solitary pellet track perforates the mid-esophagus. The left mainstem bronchus is extensively lacerated and torn.

The superior portion of the left lobe of the liver has a stellate irregular 7.5 cm. x 6 cm. laceration that extends entirely through the parenchyma. There are no pellet

BOONE AUTOPSY CONTINUED
PAGE 3
A-588-86

wounds of the liver or perforating wounds of the adjacent hemidiaphragm. The lower shotgun path passes directly above this area.    The abdominal cavity contains approximately 50 cc. of blood and fluid, most marked around the left upper quadrant.

## INTERNAL EXAMINATION:

CARDIOVASCULAR SYSTEM: The remaining fragments of the heart are 180 grams. There are identifiable fragments of right ventricle and atria only.    There are numerous perforations of the aorta surrounding the area of maceration.

RESPIRATORY TRACT: The right lung is 190 grams. The fragments of left lung are 200 grams. They contain numerous perforating wounds 2-3 mm. in diameter. It is partially pulpefied. The right lung has a pink-tan, glistening cut surface with very slight anthracotic mottling. There is a small amount of contusion of the hilum. The cut surface is pink-tan, dry and crepitant. The trachea and right mainstem bronchus contain a small amount of blood-tinged fluid and are otherwise clear. The right pulmonary artery is free of antemortem thrombus or emboli.

GASTROINTESTINAL TRACT:  The stomach contains 20 cc. of pasty tan-brown fluid. The mucosa of the esophagus, stomach and duodenum is normal, other than the previously mentioned solitary pellet hole through the esophagus.

PANCREAS: The pancreas has a pink-tan, lobulated, soft cut surface.

HEPATIC SYSTEM: The liver is 1010 grams and is normally formed, other than previously mentioned laceration. The serosal surface is tan-brown, smooth and shiny. The cut surface is tan-brown and slightly soft. The gallbladder contains 10 cc. of thin yellow-green bile.

GENITOURINARY TRACT: The right kidney is 100 grams, the left, 110 grams. The capsules strip with ease revealing smooth, tan-brown cortical surfaces with faint fetal lobulations. The cut surfaces have normal internal architecture. There is a small amount of hemorrhage in the hilum of the right lung. The ureters are of normal caliber. The bladder contains 5 cc. of medium amber urine. The internal genitalia are non-gravid adult female. Each fallopian tube has a segment of the mid portion surgically absent. The right fallopian tube has a mild hydrosalpinx of the distal portion. There are bilateral adnexal cysts up to 1 cm. in diameter.

SPLEEN: The spleen is 80 grams and is normally formed. The capsule is rose-purple, smooth and shiny. The cut surface is red-purple, slightly soft, with blurring of the follicular pattern.

ENDOCRINE SYSTEM: The pituitary is of normal size. The thyroid is of normal size with a tan-brown cut surface. The adrenals are of normal size with bright yellow cortices.

CENTRAL NERVOUS SYSTEM:  The head is without deep scalp or subgaleal hemorrhage. The skull is intact.    The dura is without antemortem thrombus or neomembrane. The brain is 1270 grams and is normally formed. The leptomeninges are thin and transparent. The vessels at the base of the brain are thin, pliable, normally formed. Serial coronal sections of the cerebrum and horizontal sections of

BOONE AUTOPSY CONTINUED
PAGE 4
A-588-86

the brainstem and cerebellum show normal distribution of gray and white matter without areas of hemorrhage or softening.

The spinal cord, in the thoracic region adjacent to the pellet tracks, has epidural hemorrhage, but no injury to the cord itself.

MICROSCOPIC EXAMINATION:

CARDIOVASCULAR SYSTEM: Sections of the left ventricular myocardium show focal fragmentation with mild associated hemorrhage. The fibers are of normal size. The fibers adjacent to the lacerations frequently have eosinophilia of the cytoplasm with pyknotic nuclei.

RESPIRATORY TRACT: Several sections of the lungs show marked collapse with focal areas of hemorrhage. The other sections show patchy atelectasis with foci of mildly dilated alveoli. The bronchi frequently contain an admixture of mucus and desquamated epithelial cells.

PANCREAS: The pancreas has normal islets and acini. There is very mild periductal fibrosis.

HEPATIC SYSTEM: Sections of the liver show areas of laceration with associated hemorrhage. The liver otherwise has normal lobular architecture and normal portal triads.

GENITOURINARY TRACT: Sections of kidneys have mild to moderate autolysis of the tubules. The glomeruli and interstitium are normal. Section of ovary shows benign cysts. Section of the uterus shows benign endometrium.

SPLEEN: The spleen has slight vascular congestion.

ENDOCRINE SYSTEM: The thyroid is composed of small to medium sized follicles with eosinophilic colloid. The adrenal cortex is normal.

CENTRAL NERVOUS SYSTEM: Section of the temporal lobe cortex shows very slight perivascular retraction spaces. Section of the cerebellar cortex is normal.

BOONE AUTOPSY CONTINUED
PAGE 5
A-588-86

<u>DIAGNOSIS</u>:     I.   Shotgun wounds of chest.
                       A.   Maceration of heart, left lung and aorta.
                       B.   Multiple rib fractures.
                       C.   Perforation of esophagus.
                       D.   Hepatic lacerations.
                       E.   Bilateral hemothoraces and mild hemoperitoneum.
                       F.   Spinal cord epidural hemorrhage.
           II.   Right hydrosalpinx.

<u>CAUSE OF DEATH</u>:  Shotgun wounds of chest, seconds.

<u>WITNESSES PRESENT</u>:  Detective Peterson, I.D. Technician Moody, Mr. Gregonis-Crime Lab, Deputy Coroner Shaw.

*Bill Saukel M.D.*
Bill Saukel, M.D.
Pathologist

BS:pl

Autopsy Completed 1440 hours, May 5, 1986.

(102)



# ROOT PATHOLOGY LABORATORY

407 E. Gilbert Suite 7
San Bernardino, CA 92404
Irving Root M.D. Director

## TOXICOLOGY REPORT

NAME: Boone, Nhung My                                    Case Number: A 0588-86
Requesting Physician: Bill Saukel M.D. Pathologist
Date Received in the Laboratory for analysis: 05/06/86

| DRUG | Heart BLOOD mg/L | URINE mg/L | GASTRIC mg/L |
|---|---|---|---|
| Pseudoephedrine | 0.04 | 13.6 | 0.0 |

No other drugs were detected in the routine drug screen. A result of 0.00 indicates that
the drugs listed were analyzed and fell below the detection limit of the method used.

Drug Screens routinely include the detection of the following classes of compounds:
Volatiles(Alcohols, etc.), Sedatives(Barbiturates, Benzodiazepines, etc.), Hypnotics,
Opiates, Analgesics, Antidepressants, Phenothiazines, Xanthines, Sympathomimetic
Amines(ie. Amphetamines, etc.), CNS Stimulants (ie. Cocaine), and Hallucinogens
(ie. Phencyclidine, Cannabinoid Metabolites, etc.)

Specimens submitted:  Heart Blood, Right Chest Blood, Urine, Gastric,
Specimens analyzed:  Heart Blood, Urine, Gastric,

Date analysis completed: 05/20/86

Technologists: _____

Director of Laboratory: _____

103.

F A 7

Thoracic abdominal, female, anterior and posterior views.



Name _Nhung Bonns_                   Autopsy No. _A - 588-86_

Age _40_   Race _Oriental_ Sex _Female_   Date _5 / 5 / 86_

#1

#2

**SHERIFF'S DEPARTMENT**
County of San Bernardino
California
CA 03600

| | |
|---|---|
| **CASE NO.** | DR 1389000-09 |
| **REPORT AREA** | |

| IE SECTION | CRIME | CLASSIFICATION |
|---|---|---|
| C 187 | HOMICIDE | |

| TIM'S NAME — LAST NAME | FIRST NAME | MIDDLE NAME | (FIRM NAME IF BUSINESS) |
|---|---|---|---|
| BOONE | NHUNG | MY | |

| DRESS | ☐ RESIDENCE | ☐ BUSINESS | PHONE ( ) |
|---|---|---|---|

## SSIGNMENT:

On 5-3-86 at approximately 1650 hours I received a phone call from Sgt. GONTHIER (San Bernardino Sheriff's Homicide Detail) advising of a homicide occurring in the 29 Palms area. I was requested to respond and give assistance at that time.

Prior to arriving in the Morongo BAsin area I was redirected by radio communication advising that the suspect had been air evact to the Desert Hospital in Palm Springs. My new assignment was to respond to the Desert Hospital and secure and attempt to interview the suspect.

## RRIVAL AT HOSPITAL:

Upon arriving at the Desert Hospital in Palm Springs at approximately 1800 hours, I made contact with a DR. JOHNSON who advised me that the subject DONALD BOONE was presently being cared for by a DR. FRENKENBERG.

DR. FRENKENBERG and other hospital emergency room personnel were working on DONALD BOONE and were not available for interviews at that time.

I received a description of the injuries to suspect BOONE from DR. JOHNSON who described them as followed. DR. JOHNSON described the entry wound to be located left of the left nipple in the chest area and that the skin area appeared to be blackened by powder burns. DR. JOHNSON described the exit wounds as being approximately three to six inches behind the entrance wound and having six separate exit points. He stated that the diameter of the exit wounds were approximately one quarter inch in diameter.

## OLLECTION OF EVIDENCE:

At approximately 1836 hours DR. FRENKENBERG removed a shotgun wadding from the ~~victim's~~ chest area and advised me that he had done so. At this time I collected the shotgun wadding and placed it in a clear plastic baggie then in a brown coin envelope. The shotgun wadding was green in color and still had blood and other body material attached to it. I also collected evidence from a GSR kit, kit number 3152, time was 2045 hours. I had been advised that the blood sample taken from the suspect BOONE prior to treatment at the Desert Hospital had been used

| TING OFFICERS | | DATE | REVIEWED BY | TYPED BY | ROUTED BY | DATE |
|---|---|---|---|---|---|---|
| NASH, Det. | N0078 | 5-9-86 | | MB B1013 | | |

| THER ACTION: | COPIES TO: | | | REMARKS | |
|---|---|---|---|---|---|
| ☐ YES   ☐ NO | ☐ Detective | ☐ SD/PD | ☐ Other | | |
| | ☐ Dist. Atty. | ☐ CII | ☐ Other | | (105) |
| 5184-401 Rev. 1/83 | | ☐ Patrol | | | |

| | CASE NO. |
|---|---|
| **...IFF'S DEPARTMENT** | DR 1389000-09 |
| County of San Bernardino | |
| California | REPORT AREA |
| **CA 03600** | |

| E SECTION | CRIME | CLASSIFICATION |
|---|---|---|
| C 187 | HOMICIDE | |

| IM'S NAME — LAST NAME | FIRST NAME | MIDDLE NAME | (FIRM NAME IF BUSINESS) |
|---|---|---|---|
| BOONE | NHUNG | MY | |

| RESS | ☐ RESIDENCE | ☐ BUSINESS | PHONE ( ) |
|---|---|---|---|

age 2

OLLECTION OF EVIDENCE:  (Continued)

completely, therefore a second sample of blood was taken from BOONE
after being treated in the emergency room.  The blood sample was taken
by a MR. HARWOOD (R.N.) at the time of 2053 hours.

| RTING OFFICERS | | DATE | REVIEWED BY | TYPED BY | ROUTED BY | DATE |
|---|---|---|---|---|---|---|
| NASH, Det. | N0078 | 5-9-86 | | MB B1013 | | |

| HER ACTION: | COPIES TO: | ☐ SD/PD | ☐ Other | REMARKS |
|---|---|---|---|---|
| YES ☐ NO | ☐ Detective | ☐ CII | ☐ Other | |
| | ☐ Dist. Atty. | ☐ Patrol | | |

84-401 Rev. 1/83

**ᴴᴿIFF'S DEPARTMENT**

County of San Bernardino
California

**CA 03600**

| CASE NO. |
|---|
| DR 1389000-09 |

**REPORT AREA**

| E SECTION | CRIME | | CLASSIFICATION |
|---|---|---|---|
| ℂ 187 | HOMICIDE | | |

| ᴵM'S NAME — LAST NAME | FIRST NAME | MIDDLE NAME | (FIRM NAME IF BUSINESS) |
|---|---|---|---|
| BOONE | NHUNG | MY | |

| ᴿESS | ☐ RESIDENCE | ☐ BUSINESS | PHONE |
|---|---|---|---|
| | | | ( ) |

age 3

---

## NTERVIEW:

### DR. FRENKENBERG

On 5-3-86 at approximately 1905 hours, I interviewed DR. FRENKENBERG
in the emergency room of the Desert Hospital. DR. FRENKENBERG advised
that the suspect had received one shotgun wound to the left chest area.
The X-ray revealed no buck shot. He went on to state that no vital
organs were hit nor were any bones. I asked DR. FRENKENBERG if the
suspect BOONE was able to respond to questioning and when would he be
available for transport to San Bernardino County at which time FRENKENBERG
stated that the subject is conscious and able to respond to questioning
and that he would be available for transport on 5-4-86. DR. FRENKENBERG
had no more information concerning the wounds, therefore the interview
was concluded.

---

| ᴵᴺG OFFICERS | | DATE | REVIEWED BY | TYPED BY | ROUTED BY | DATE |
|---|---|---|---|---|---|---|
| NASH, Det. | N0078 | 5-9-86 | | MB B1013 | | |

| ᴴER ACTION: | COPIES TO: | | | REMARKS |
|---|---|---|---|---|
| ☐ YES ☐ NO | ☐ Detective | ☐ SD/PD | ☐ Other | |
| | ☐ Dist. Atty. | ☐ CII | ☐ Other | |
| 184-401 Rev. 1/83 | | ☐ Patrol | | |

107

| | CASE NO. |
|---|---|
| **RIFF'S DEPARTMENT**<br>County of San Bernardino<br>California<br>**CA 03600** | DR 1389000-09 |
| | **REPORT AREA** |

| E SECTION | CRIME | | CLASSIFICATION | |
|---|---|---|---|---|
| **: 187** | **HOMICIDE** | | | |
| **'IM'S NAME — LAST NAME** | **FIRST NAME** | | **MIDDLE NAME** | **(FIRM NAME IF BUSINESS)** |
| BOONE | NHUNG | | MY | |
| **RESS** | ☐ RESIDENCE | ☐ BUSINESS | | PHONE ( ) |

ge 4

## INTACT AND SPONTANEOUS STATEMENTS BY SUSPECT:

> DONALD BOONE
> DOB: 4-20-54

On 5-3-86 at approximately 1910 hours, I interviewed the suspect DONALD BOONE in the emergency room of Desert Hospital in Palm Springs. After approaching BOONE and identifying myself, I asked BOONE if he could explain what happened at which time he gave me the following information.

BOONE stated that he had attempted to get his wife to reconsider about what she was doing and she refused. He stated at that time he went into the bedroom and got the shotgun, walked back out to the living room area where the victim, MRS. BOONE, was lying on the couch. He told her, "You made me do this". BOONE then stated that the victim attempted to guard herself by raising her foot and that he fired twice, striking her in the chest area. He stated that he then called his next door neighbor so his daughter would not come home and see her mother like that and then he went over, sat down on the couch and shot himself. BOONE continued and stated that he then went and laid by his wife's side when he heard someone knocking on the door and got up, answered the door and let two guys come into the house. He stated that he then returned to the couch and sat down. Approximately 10 minutes later Sheriff's Deputies arrived and he advised the Deputies that he shot his wife and himself. At that time I asked DONALD BOONE if the Deputies advised him of his rights and he replied, "I don't think so" at which time I read BOONE his constitutional rights, reading from the Miranda card issued by San Bernardino Sheriff's Office, revised 1978. I received the following responses to the waiver portion of the Miranda card. Question number one yes. Question number two "I think that I should wait and talk to a lawyer first". The interview was ended at 1917 hours.

The above statements made by DONALD BOONE in the emergency room were taped recorded by this officer and witnessed by Deputy WEBB and Reserve Deputy GIERTZ both of the Morongo Station.

## SPOSITION:

Evidence I collected at the hospital were turned over to the Crime Lab

| TING OFFICERS | | DATE | REVIEWED BY | TYPED BY | ROUTED BY | DATE |
|---|---|---|---|---|---|---|
| NASH, Det. | N0078 | 5-9-86 | | MB B1013 | | |

| HER ACTION: | COPIES TO: | | REMARKS | |
|---|---|---|---|---|
| ☐ YES  ☐ NO | ☐ Detective  ☐ Dist. Atty. | ☐ SD/PD  ☐ CII  ☐ Patrol | ☐ Other  ☐ Other | |

L84-401 Rev. 1/83

| | CASE NO. |
|---|---|
| **SHERIFF'S DEPARTMENT** | DR 1389000-09 |
| County of San Bernardino | |
| California | REPORT AREA |
| CA 03600 | |

| E SECTION | CRIME | | CLASSIFICATION | |
|---|---|---|---|---|
| C 187 | HOMICIDE | | | |
| IM'S NAME — LAST NAME | FIRST NAME | | MIDDLE NAME | (FIRM NAME IF BUSINESS) |
| BOONE | NHUNG | | MY | |
| RESS | ☐ RESIDENCE | ☐ BUSINESS | | PHONE ( ) |

age 5

ISPOSITION: (Continued)

Criminalist DAN GREGONIS at 2310 hours on 5-3-86.  Case to date.

| TING OFFICERS | | DATE | REVIEWED BY | TYPED BY | ROUTED BY | DATE |
|---|---|---|---|---|---|---|
| NASH, Det. | N0078 | 5-9-86 | | MB B1013 | | |

| THER ACTION: | COPIES TO: | ☐ SD/PD | ☐ Other | REMARKS |
|---|---|---|---|---|
| ☐ YES  ☐ NO | ☐ Detective | ☐ CII | ☐ Other | |
| | ☐ Dist. Atty. | ☐ Patrol | | |

184-401 Rev. 1/83

DR# 1389000-09

SHES DEPARTMENT

County of San Bernardino
California

CA 03600

REPORT AREA

SIX

| CTION | CRIME | CLASSIFICATION |
|---|---|---|
| 87 | MURDER | SHOTGUN/DOMESTIC VIOLENCE |

| NAME — LAST NAME | FIRST NAME | MIDDLE NAME | (FIRM NAME IF BUSINESS) |
|---|---|---|---|
| E. NHUNG MY | | | |

S

☐ RESIDENCE   ☐ BUSINESS

PHONE
( )

**RVIEW/THOMAS HENRY PAPE: (continued)**

He did not actually see Mr. BOONE. He told me that it was between 1430 and 1445 hours. He told me that when he learned that a shooting had occurred and that Mr. BOONE had shot himself, he went down to the suspect residence. He drove down and his friend, Mr. MC WHIRTER, ran down. They got down there, stood by the front door. He called out to DON to come open the door. He heard Mr. BOONE say, GO AWAY and then all of a sudden Mr. BOONE opened the door. He told me that he and MC WHIRTER ran in and BOONE sat down on the couch. He could see that he had a chest wound. He began assisting suspect BOONE and tending to his wound. He noted that Mrs. BOONE was lying on the sofa and appeared to be dead. He told me that his friend, Mr. MC WHIRTER, went over to check on her. He also said Mr. MC WHIRTER went to pick up a shotgun, but he told him to put it down. It was laying on the floor in the living room.

Mr. PAPE went into the bathroom and pulled some clothing item, he doesn't remember what it was, brought it back and applied it to victim's chest to help stop the bleeding. He did not see very much blood. There was no blood on the floor or around the house, but just on the victim and the suspect.

He told me that suspect BOONE made several statements, GOD TAKE ME QUICK. I CAN'T LET HER RUIN ANYBODY'S ELSES LIFE. He said to Mr. PAPE, PLEASE HAVE BONNIE TAKE CARE OF THE CHILD. TELL HER I LOVE HER. He then stated, SHE WAS GOING TO TAKE HER AWAY FROM ME. I DIDN'T WANT TO LIVE IN PRISON.

Mr. PAPE told me also that he ran into the bedroom, removed a comforter or a blanket from the bed and took it out to cover up suspect BOONE so that he wouldn't go into shock. As he was pulling the blanket from the bed, he saw two shotgun rounds roll off of the blanket onto the floor in the bedroom. He went back into the living room, stayed with the suspect. He heard him make a further statement, I SHOT HER. I SAT WITH HER FOR A WHILE AND THEN SHOT MYSELF. He also stated, I LEFT A NOTE ON THE DRESSER. I WANT HEATHER TO GO TO MY PARENTS, HER GRANDPARENTS. At this time rescue and sheriff personnel arrived and Mr. PAPE had nothing further to offer and the interview was concluded.

**ERVIEW/HELEN KAY FULLEN:**

On 5-3-86 at 1939 hours I conducted an interview with Miss FULLEN at the Morongo Sheriff's Station. Miss FULLEN is the daughter of the deceased NHUNG BOONE. She resided at 7065 Alpine same address as the victim. She is employed by the base commissary, works at the arcade. Her phone number is 368-6922. She was living with her mother at 7065 Alpine and suspect, DONALD BOONE and her step-sister, HEATHER. I asked Miss FULLEN when was

| TING OFFICERS | DATE | REVIEWED BY | TYPED BY | ROUTED BY | DATE |
|---|---|---|---|---|---|
| ULLENS M-3330 | 5-3-86 | | JB 5-14-86 | | |

ER ACTION:   COPIES TO:

☐ SD/PD   ☐ Other
☐ CII     ☐ Other

/ES ☐ NO   ☐ Detective
          ☐ Dist. Atty.   ☐ Patrol

REMARKS

14-401 Rev. 1/83

SH[ ]F'S DEPARTMENT
County of San Bernardino
California
CA 03600

EVEN

DR# 1389000-09

REPORT AREA

| :ECTION | CRIME | CLASSIFICATION | |
|---------|-------|----------------|---|
| L87 | MURDER | SHOTGUN/DOMESTIC VIOLENCE | |

| 'S NAME — LAST NAME | FIRST NAME | MIDDLE NAME | (FIRM NAME IF BUSINESS) |
|---------------------|------------|-------------|------------------------|
| IE, NHUNG MY | | | |

| SS | ☐ RESIDENCE | ☐ BUSINESS | PHONE ( ) |
|----|-------------|------------|-----------|

IERVIEW/HELEN KAY FULLEN (continued)

the last time that she had personal contact with her mother. She told me approximately two days ago. The last two days she had been away. She stayed at two motels in the 29 Palms area. Thursday night at the 29 Palms Motel and Friday night at the Civic Motel in 29 Palms. She stayed the two nights at the motels with her boyfriend, AL GRECO, who is a marine attached with H&S Battalion, Marine Corps Base at 29 Palms with a phone number of 368-6786.

Miss FULLEN told me that she returned to her residence on 5-3-86, Saturday at 1230 hours. Her mother was at work and the only persons home were her step-father, DON and her sister, HEATHER. She did place a phone call to her mother who was at work, had a brief conversation with her and no problems were reported on the phone. She told me also that her step-father appeared to be in a good mood and did not speak of any problems. She stayed about 20 to 30 minutes then left and later went to work without returning to her residence.

I next discussed with her how long her step-father had been back from over-seas and living at the residence. She tells me that to the best of her knowledge he returned home on 4-23-86. On the day that he returned home which was a surprise, he was expected home on April 30, 1986, he found her mother with her mother's boyfriend, JEFF CRANE. There was a fight and the suspect beat up CRANE. He stayed at the house that night. The next day he then kicked them out of the house, referring to herself, her mother and step-sister HEATHER. He stated to them, GET OUT OF THE HOUSE OR I AM GOING TO HURT YOUR MOTHER.

I asked her why her step-father was at the house for the last several days and she told me that her mother had gotten a restraining order against DONALD BOONE and then moved back into the house after he had to leave. Two days later her mother had let the suspect sleep on the sofa. When she had a talk with her mother about this, she was told that the victim felt sorry for him and let him stay on the couch. Then after that the victim permitted Mr. BOONE to stay in a camper behind the house. This was the middle of the week prior to the date of the homicide.

I asked Miss FULLEN next were there any threats that she was aware of that were made by the suspect against the victim. She told me that on the day that they threw him out of the house, the suspect had stated to her (the mother was not present), I SHOULD HAVE KILLED THEM BOTH, referring to her mother and JEFF CRANE, WHILE I HAD THE CHANCE.

I asked her about any weapons, guns, rifles or shotguns. If she had ever seen any

| ING OFFICERS | DATE | REVIEWED BY | TYPED BY | ROUTED BY | DATE |
|--------------|------|-------------|----------|-----------|------|
| ULLENS M-3330 | 5-3-86 | | JB 5-14-86 | | |

| R ACTION: | COPIES TO: | | REMARKS | |
|-----------|-----------|---|---------|---|
| :S ☐ NO | ☐ Detective ☑ SD/PD ☐ Other | ☐ Other | | |
| | ☐ Dist. Atty. ☐ CII ☐ Patrol | | | |

401 Rev. 1/83

SH⬤FF'S DEPARTMENT
County of San Bernardino
California
CA 03600

**DR# 1389000-09**

**REPORT AREA**

⬤ EIGHT

| SECTION | CRIME | CLASSIFICATION |
|---|---|---|
| 187 | MURDER | SHOTGUN/DOMESTIC VIOLENCE |

| M'S NAME — LAST NAME | FIRST NAME | MIDDLE NAME | (FIRM NAME IF BUSINESS) |
|---|---|---|---|
| )NE, NHUNG MY | | | |

| ESS | ☐ RESIDENCE | ☐ BUSINESS | PHONE ( ) |
|---|---|---|---|

---

**ERVIEW/HELEN KAY FULLEN (continued)**

around the house.  She told me no.  She has heard her mother speak of a shotgun.  She told me that on one occasion her mother told her about an argument between the victim and suspect and in the argument the suspect made a statement about the shotgun that he had.  He apparently told the victim, I HAVE GOT A SHOTGUN IN THE BACK ROOM.  WHY DON'T YOU PUT IT TO YOUR HEAD AND DO EVERYBODY A FAVOR?  I WILL EVEN LOAD IT.  She asked her mother where the shotgun was at and she told her it was in the bedroom.  This is the only discussion that she ever had with her mother about a weapon.

I asked her about her mother's boyfriend, JEFF CRANE.  She told me that he is New York for a week.  JEFF Is in the Marine Corp on medical leave.  He lives in 29 Palms in a trailer park possibly on Ocotillo.  She does not know the address.  He lives at that location with a subject named BOB who is a vacuum cleaner salesman.

She was asked about friends of her mother who might have any additional information.  She spoke of a friend named PHONG who lived in 29 Palms with a phone number of 367-6690 and another friend named TONY who is a cashier at the base exchange where her mother works.  She tells me that her mother often rides to work with TONY and possibly rode to work with her on the day of the incident.  She had nothing further to add and the interview was concluded.

**POSITION:**

Case cleared by arrest.  Report to be forwarded to District Attorney's office for review and complaint.

---

| TING OFFICERS | DATE | REVIEWED BY | TYPED BY | ROUTED BY | DATE |
|---|---|---|---|---|---|
| MULLENS M-3330 | 5-3-86 | | JB 5-14-86 | | |

| ER ACTION: | COPIES TO: | ☐ SD/PD | ☐ Other | REMARKS |
|---|---|---|---|---|
| ES ☐ NO | ☐ Detective | ☐ CII | ☐ Other | |
| | ☐ Dist. Atty. | ☐ Patrol | | |

s-401 Rev. 1/83

IFF'S DEPARTMENT
County of San Bernardino
California
CA 03600

DR# 1389000-09

REPORT AREA

ONE

| E SECTION<br>C 187 | CRIME<br>MURDER | | CLASSIFICATION<br>SHOTGUN/DOMESTIC VIOLENCE |
|---|---|---|---|
| TIM'S NAME — LAST NAME<br>OONE, NHUNG MY | FIRST NAME | MIDDLE NAME | (FIRM NAME IF BUSINESS) |
| RESS | ☐ RESIDENCE  ☐ BUSINESS | | PHONE<br>(   ) |

## S U P P L E M E N T A L

USPECT/BOONE, DONALD WAYNE:

NTERVIEW/MARY FIELDING:

She provided me with a mailing address of HCO 2, Box 354-M, 29 Palms and a phone number of 367-9624. She is the supervisor over the cashiers at base commisary and this includes baggers. Her work phone number is 368-6325.

Miss FIELDING told me that the victim was a bagger at the base exchange. Miss FIELDING was also working Saturday 5-3-86. She told me that the victim showed up for work between 0835 and 0840 hours and that she was a little late as she was to report for work at 0830 hours.

I asked her if she knew who the victim arrived at work with and she told me that she believed that it was her husband. This is what she was told later by the victim. She did not actually see her dropped off by the suspect. She believes that she left work around 1550 hours. She told me that she had just looked at the clock when she saw the victim leave the commisary. She left work by herself. Again she believed that her husband was out there to pick her up. I asked her if the victim had a time clock or time sheet that she checked in and checked out with when she left work and she told me no that they just report for work at a specific time. The baggers are not paid by the exchange as they make their money from tips from the customers. They can work as much as they want to or as little as they want to.

She told me that suspect was in the store at approximately 1445 hours. He came in to talk with his wife the victim. She first noticed him yelling over to his wife to get her attention. He did not seem to be upset he was just trying to get her attention. She told me that the two of them walked around the corner out of sight and then a short while later she returned and went back to work. She had coffee with the victim sometime in the day on Saturday and they spoke about the victim wanting a divorce. Mrs. FIELDING was aware of a lot of the problems that the victim was going through. Mrs. FIELDING also knew that the victim had received a phone call from JEFF CRANE on Saturday while the victim was at work. She also overheard a conversation that the victim had with suspect over the telephone while victim was at work. She was pretty positive that Mrs. BOONE was talking to her husband due to the statements that she was making. She had stated something about that she had just spoken with JEFF and that she can go out with whoever she wants to and she still wants her divorce. This phone conversation was prior to Mr. BOONE coming in to the store.

Mrs. FIELDING told me that the victim had been working with a TONY GONZALES that day.

| ORTING OFFICERS<br>MULLENS M-3330 | DATE<br>5-3-86 | REVIEWED BY | TYPED BY<br>JB 5-14-86 | ROUTED BY | DATE |
|---|---|---|---|---|---|

| THER ACTION: | COPIES TO: | | | REMARKS |
|---|---|---|---|---|
| ☐ YES  ☐ NO | ☐ Detective  ☐ Dist. Atty. | ☐ SD/PD  ☐ CII  ☐ Patrol | ☐ Other  ☐ Other | |

5184-401 Rev. 1/83

S      FF'S DEPARTMENT
County of San Bernardino
California

CA 03600

| | | | DR# 1389000-09 |
|---|---|---|---|
| | | | REPORT AREA |

TWO

| SECTION | CRIME | CLASSIFICATION |
|---|---|---|
| 187 | MURDER | SHOTGUN /DOMESTIC VIOLENCE |

| 'S NAME — LAST NAME | FIRST NAME | MIDDLE NAME | (FIRM NAME IF BUSINESS) |
|---|---|---|---|
| )NE, NHUNG MY | | | |

| ESS | | RESIDENCE | | BUSINESS | | PHONE ( ) |
|---|---|---|---|---|---|---|

**ERVIEW/MARY FIELDING (continued)**

TONY GONZALES was the cashier and the victim was the bagger and that TONY and the victim were good friends. She then went over and got TONY GONZALES and the interview was concluded with Mrs. FIELDING.

**ERVIEW/TONY MARIE GONZALES:**

Mrs. GONZALES resides at 6031 Lupine in 29 Palms and has a phone number of 367-6003. She works at the base exchange and was working on Saturday 5-3-86 from 0830 to 1600 hours. She is a cashier and that on many occasions the victim, Mrs. BOONE, is her bagger.

She told me that arrangements had been made on Friday 5-2-86 for her to come by on Saturday morning and pick up the victim and drive her to work. She arrived at the house on Saturday morning and made contact with DONALD who apparently answered the door. DONALD told her that he was going to take the victim to work. She began to leave and then became concerned because of the problems that they are having and she wanted to see if Mrs. BOONE was alright. She asked DONALD if she could talk to Mrs. BOONE. He said he would get her, but she would have to wait a minute because he had no clothes on. She made contact with Mrs. BOONE who said that they had overslept and that DONALD would drive her to work.

Later at work she had a conversation with the victim. She was aware that there was a restraining order, but was told by the victim that DONALD had been staying at the house and had been sleeping in the same room with HEATHER. She also knows that on Saturday the victim received a phone call from JEFF CRANE and she learned that CRANE had called the victim Friday night and DONALD answered at the house and then DONALD unplugged the phone and did not tell the victim that JEFF had called. This made victim very upset and apparently DONALD had told JEFF that he couldn't see the victim anymore. The victim had called DONALD from work and had an argument with him over the phone in regards to the telephone conversation she had with JEFF CRANE.

Mrs. GONZALES is pretty much aware of all of the problems between the victim and the suspect and she is aware of the relationship between JEFF CRANE and the victim. To the best of her knowledge, CRANE is in New York and will soon be returning to California. She told me to contact the victim's best friend, a Mrs. FLORES at 367-6690. She had no further information.

| TING OFFICERS | DATE | REVIEWED BY | TYPED BY | ROUTED BY | DATE |
|---|---|---|---|---|---|
| MULLENS M3330 | 5-3-86 | | JB 5-14-86 | | |

| ER ACTION: | COPIES TO: | SD/PD | Other | REMARKS |
|---|---|---|---|---|
| YES   NO | Detective | CII | Other | |
| | Dist. Atty. | Patrol | | |

84-401 Rev. 1/83

(14)

SHERIFF'S DEPARTMENT
County of San Bernardino
California

CA 03600

DR# 1389000-09

REPORT AREA

THREE

| SECTION | CRIME | CLASSIFICATION |
|---|---|---|
| 187 | MURDER | SHOTGUN/DOMESTIC VIOLENCE |

'S NAME — LAST NAME          FIRST NAME          MIDDLE NAME          (FIRM NAME IF BUSINESS)

NE, NHUNG MY

:SS          ☐ RESIDENCE     ☐ BUSINESS          PHONE
( )

POSITION:     —

— Case cleared by arrest.

| TING OFFICERS | DATE | REVIEWED BY | TYPED BY | ROUTED BY | DATE |
|---|---|---|---|---|---|
| MULLENS M-3330 | 5-3-86 | | JB 5-14-86 | | |

ER ACTION:          COPIES TO:          ☐ SD/PD     ☐ Other          REMARKS

YES  ☐ NO          ☐ Detective     ☐ CII     ☐ Other

14-401 Rev. 1/83          ☐ Dist. Atty.     ☐ Patrol

SHERIFF'S DEPARTMENT
County of San Bernardino
California

CA 03600

| | DR# 1389000-09 |
|---|---|
| | REPORT AREA |

PAGE ONE

| SECTION | CRIME | CLASSIFICATION | |
|---|---|---|---|
| C 187 | MURDER | | |

| 'S NAME — LAST NAME | FIRST NAME | MIDDLE NAME | (FIRM NAME IF BUSINESS) |
|---|---|---|---|
| BOONE, NHUNG MY | | | |

| ESS | | RESIDENCE | BUSINESS | PHONE ( ) |
|---|---|---|---|---|

### S U P P L E M E N T A L

**USPECT INFORMATION:**

BOONE, DONALD WAYNE

**NTERVIEW/BOONE, HEATHER WFJ:**

On 5-21-86 Wednesday at 0845 hours I conducted an interview with HEATHER BOONE, WFJ aged 7, at the Morongo Sheriff's Station.

I had learned from previous interviews that HEATHER had tried to hide the shotgun the alleged weapon used in the homicide. I asked HEATHER if she had seen a shotgun, rifle or long gun weapon at her house thast belonged to her father. She told me that she has seen such a weapon. When asked when, she told me a long time ago. This was prior to the return of her father from overseas. She has not seen the weapon since his return from overseas. When she saw the weapon it was in the closet of her mother's bedroom and she told me that it was way back in the closet.

I discussed with her any threats that she might have overheard her father make towards other family members. Apparently she did overhear a threat made by her father to kill her mother. She told me that he had also threatened to kill JEFF, the mother's boyfriend. He did not make any threats to kill any other family members, herself or her sister, HELEN.

We again discussed the weapon. A Mrs. STEVIE DILLAREAL, foster mother, was present at the interview and she told me that she overheard the child talk about the shotgun. That the child had gone into bedroom, after her father returned from overseas, to hide the shotgun, but her father had come in before she could do it. I asked her again as I had done earlier in the interview, if she had seen the shotgun and was it true that she went into the room to hide it and she said yes. Apparently she was afraid that her father was going to hurt her mother with the shotgun and didn't want her father to kill her mother. HEATHER had no other information and the interview was concluded.

**ISPOSITION:**

Case cleared by arrest. Report forwarded to District Attorney's office for review.

| TING OFFICERS | DATE | REVIEWED BY | TYPED BY | ROUTED BY | DATE |
|---|---|---|---|---|---|
| MULLENS, M3330 | 5-21-86 | | JB 5-22-86 | | |

| IER ACTION: | COPIES TO: | | | REMARKS |
|---|---|---|---|---|
| YES ☐ NO | ☐ Detective ☐ Dist. Atty. | ☐ SD/PD ☐ CII ☐ Patrol | ☐ Other ☐ Other | |

14-401 Rev. 1/83








IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

This 11th day of JULY, 1986

FILED - North Desert District
San Bernardino County Clerk

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, ) | JUL 11 1986 |
| Plaintiff, ) | |
| -vs- ) | BCR No. 667Y *Deborah A. Shaw* |
| DONALD WAYNE BOONE, ) | J. 40089 Deputy |
| D-001 Defendant. ) | I N F O R M A T I O N |

DONALD WAYNE BOONE

is hereby accused by the District Attorney of the County of San Bernardino

of a felony, to wit,

MURDER  (P.C. 187)

in that on or about May 3, 1986, in the County of San Bernardino, State of

California, he did unlawfully kill Nhung My Boone, a human being, with malice

aforethought.

IT IS FURTHER ALLEGED that in the commission of the above offense the

said defendant, DONALD WAYNE BOONE, used a firearm, to wit, a 12 guage shotgun,

within the meaning of Penal Code Section 12022.5.

DENNIS KOTTMEIER
District Attorney

By *Ronald Barbatoe*
Ronald Barbatoe
Deputy District Attorney

RB:ls

