# EXHIBIT 4
# Part 1 of 2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS


In the matter of the Life      )
Term Parole Consideration      )        CDC Number D-37952
Hearing of:                    )
                               )
DONALD BOONE                   )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

APRIL 27, 2005



PANEL PRESENT:

STEPHEN LEE, Presiding Commissioner
KENNETH CATER, Deputy Commissioner

OTHERS PRESENT:

DONALD BOONE, Inmate
HAROLD WILSON, Deputy District Attorney




CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No          See Review of Hearing
_____  Yes         Transcript Memorandum


**Marsha Mees**              **Capitol Electronic Reporting**

ii

## INDEX

|                              | Page |
|------------------------------|------|
| Proceedings                  | 1    |
| Case Factors                 | 9    |
| Pre-Commitment Factors       | 22   |
| Post-Commitment Factors      | 25   |
| Parole Plans                 | 42   |
| Closing Statements           | 60   |
| Recess                       | 66   |
| Decision                     | 67   |
| Adjournment                  | 71   |
| Transcriber Certification    | 72   |

--oOo--

1

## P R O C E E D I N G S

1

2          **PRESIDING COMMISSIONER LEE:**  This is a

3  subsequent parole consideration -- for Mr. -- just a

4  second -- Donald Boone, B-O-O-N-E.  Sir, before we

5  go any further, you do not have an attorney with

6  you.

7          **INMATE BOONE:**  Yes, Sir.

8          **PRESIDING COMMISSIONER LEE:**  Is that your

9  choice?

10          **INMATE BOONE:**  Yes, Sir.

11          **PRESIDING COMMISSIONER LEE:**  (Inaudible).

12          **DEPUTY COMMISSIONER CATER:**  I did not pull it

13  out.

14          **PRESIDING COMMISSIONER LEE:**  (Inaudible)

15  verify something.  Did someone go over your rights

16  to represent yourself?

17          **INMATE BOONE:**  Yes, Sir.

18          **PRESIDING COMMISSIONER LEE:**  And when did

19  that do that, sir?

20          **INMATE BOONE:**  When I signed the waiver for

21  any attorney.

22          **PRESIDING COMMISSIONER LEE:**  Okay.  And who

23  did that?

24          **INMATE BOONE:**  The counselor.

25          **PRESIDING COMMISSIONER LEE:**  All right.  At

26  this point in time I need to go through it with you

27  once again to make sure that that's what you wish to

2

1    do.

2         **INMATE BOONE:**  Okay.

3         **PRESIDING COMMISSIONER LEE:**  Number one, you

4    have the right to represent yourself, that is a

5    constitutional right.  However, that right is

6    limited to your ability to represent yourself.  Sir,

7    how many years of education do you have?

8         **INMATE BOONE:**  Twelve.

9         **PRESIDING COMMISSIONER LEE:**  Twelve.

10        **INMATE BOONE:**  Yes, Sir.

11        **PRESIDING COMMISSIONER LEE:**  All right.  Have

12   you ever represented yourself before?

13        **INMATE BOONE:**  Yes, Sir.

14        **PRESIDING COMMISSIONER LEE:**  Okay.  When?

15        **INMATE BOONE:**  Two prior hearings.

16        **PRESIDING COMMISSIONER LEE:**  Okay.  Was that

17   the time that you were actually given a date?

18        **INMATE BOONE:**  No, Sir.  That was the one

19   before that, 2001.

20        **PRESIDING COMMISSIONER LEE:**  Okay.  And how

21   many hearings have you actually been a part of?

22        **INMATE BOONE:**  Representing myself?

23        **PRESIDING COMMISSIONER LEE:**  No, all of them

24   together.

25        **INMATE BOONE:**  Six.

26        **PRESIDING COMMISSIONER LEE:**  Six?

27        **INMATE BOONE:**  Yes, Sir.

3

1          **PRESIDING COMMISSIONER LEE:**  All right.  Now

2    you have had an opportunity to go over the law in

3    regards to -- for example Penal Code section 3041

4    and 3042?

5          **INMATE BOONE:**  Yes, Sir.

6          **PRESIDING COMMISSIONER LEE:**  All right.  And

7    at this point in time do you feel comfortable to

8    continue on?

9          **INMATE BOONE:**  Yes, Sir.

10         **PRESIDING COMMISSIONER LEE:**  All right.  I

11   have an exhibit list and I'm going to ask at this

12   time whether or not you have all the documentation,

13   going to have it marked Exhibit One.  Now this is

14   out of order.  I usually don't do it in this

15   fashion, but I want to make sure that we're going to

16   continue (inaudible) at this time.  Okay.  Would you

17   please take a look at it to see whether or not you

18   have all the documents there?

19         **INMATE BOONE:**  Yes, Sir, I have everything

20   listed here.

21         **PRESIDING COMMISSIONER LEE:**  Thank you.  Sir,

22   could you give that to the District Attorney.

23         **DEPUTY DISTRICT ATTORNEY WILSON:**

24   Commissioner, I have all those documents.

25         **PRESIDING COMMISSIONER LEE:**  Very good.  All

26   right.  At this time then I'm going to formally

27   begin the hearing.  This is a subsequent parole

4

1    .consideration -- for Donald Boone, CDC number

2    D-37952.  The date of the hearing is April 27 the

3    year 2005.  We are currently located at the

4    Correctional Training Facility in Soledad.  The

5    inmate was received on September 4, 1986 from San

6    Bernardino County in case number BCR667.  The

7    offense, murder in the second degree pursuant to

8    Penal Code section 187 slash 12022.5.  Term was set

9    at 15 years to life plus two years for the gun

10   enhancement.  Minimum eligibility for parole is

11   December 4 the year 1996.  At this time, sir, this

12   hearing is being tape recorded.  And for the

13   purposes of voice identification each of us will

14   say our first name, spelling our last names.

15   After you say your name and spell your last name,

16   please also give us your CDC number.  My name is

17   Stephen Lee, L double E, I'm the presiding

18   Commissioner.

19        **DEPUTY COMMISSIONER CATER:**  Kenneth Cater,

20   C-A-T-E-R, Deputy Commissioner.

21        **DEPUTY DISTRICT ATTORNEY WILSON:**  Harold

22   Wilson, W-I-L-S-O-N, Deputy District Attorney, San

23   Bernardino County.

24        **INMATE BOONE:**  Donald Boone, B-O-O-N-E,

25   D-37952.

26        **PRESIDING COMMISSIONER LEE:**  Okay.  Sir,

27   there's a document in front of you, do you see

5

1    that?  It's underneath your stack.

2        **INMATE BOONE:**  Okay.

3        **PRESIDING COMMISSIONER LEE:**  Okay.  Would

4    you read that to us please.

5        **INMATE BOONE:**  ADA, the Americans With

6    Disabilities Act.  The Americans With Disabilities

7    Act, ADA, is a law to help people with

8    disabilities.  Disabilities are problems that make

9    it harder for some people to see, hear, breathe,

10   talk, walk, learn, think, work or take care of

11   themselves than it is for others.  Nobody can be

12   kept out of public areas or activities because of

13   a disability.  If you have a disability, you have

14   the right to ask for help to get ready for your

15   BPT hearing, get to the hearing, talk, read forms

16   and papers and understand the hearing process.

17   BPT will look at what you asked for to make sure

18   that you have a disability that is covered by the

19   ADA and that you have asked for the right kind of

20   help.  If you do not get help or if you do not

21   think you got the kind of help you need, ask for a

22   BPT 1074 Grievance Form.  You can also get help to

23   fill it out.

24       **PRESIDING COMMISSIONER LEE:**  All right.

25   Sir, do you have any disabilities that you know of

26   that would interfere with your participating in

27   this hearing?

6

1       **INMATE BOONE:** No, Sir.

2       **PRESIDING COMMISSIONER LEE:** All right. You

3    are wearing glasses. Those are -- accommodation.

4    That means that they will assist you in

5    participating in this hearing. Sir, are your

6    classes -- your glasses, I should say, adequate

7    for you to participate with this hearing?

8       **INMATE BOONE:** Yes, Sir.

9       **PRESIDING COMMISSIONER LEE:** All right.

10   Have you ever had any special ed courses, been a

11   part of the Triple CMS or EOP programs?

12      **INMATE BOONE:** No, Sir.

13      **PRESIDING COMMISSIONER LEE:** Do you take any

14   type of psychotropic medication?

15      **INMATE BOONE:** No, Sir.

16      **PRESIDING COMMISSIONER LEE:** Have you ever

17   taken any psychotropic medication?

18      **INMATE BOONE:** No, Sir.

19      **PRESIDING COMMISSIONER LEE:** All right.

20   This hearing is conducted pursuant to Penal Code

21   Sections 3041 and 3042 as well as the rules and

22   regulations of the Board of Prison Terms governing

23   parole considerations for lifer inmates. The

24   purpose of today's hearing is to once again

25   consider your suitability for parole. In doing so

26   we will consider your commitment charge and your

27   prior social history and criminal history as well

7

1    as your behavior and programming since your

2    commitment.  We've had an opportunity to review

3    your Central File and your prior transcripts.  And

4    you will be given an opportunity to correct or

5    clarify them on the record.  We will consider your

6    progress since your last hearing, your

7    psychological report and any other information

8    that may have bearing on your suitability for

9    parole.  Any change in your parole plans should be

10   brought to our attention.  We will reach a

11   decision today and you will be informed of our

12   decision.  You've gone through this before.

13   Before we recess for deliberations you and the

14   Deputy District Attorney will be given an

15   opportunity to make a statement.  Your statement

16   will be limited to why you feel you are suitable

17   for parole.  We will come back once we've made a

18   decision and announce our decision.  The

19   California Code of Regulations states that

20   regardless of time served a life inmate shall be

21   found unsuitable for and denied parole if in the

22   judgment of the Panel the inmate would pose an

23   unreasonable risk -- to society if released from

24   prison.  Sir, do you understand the standard which

25   we go by?

26          INMATE BOONE:  Yes, Sir.

27          PRESIDING COMMISSIONER LEE:  Okay.  You also

8

1    understand that the final say is in the Governor's

2    hands?

3         INMATE BOONE:  Yes, Sir.

4         PRESIDING COMMISSIONER LEE:  All right.  You

5    have certain rights.  These rights include the

6    right to timely notice of the hearing, the right

7    to review your Central File and the right to

8    present relevant documents.  Do you have any

9    documents to submit to us at this time?

10        INMATE BOONE:  Yes, Sir.

11        PRESIDING COMMISSIONER LEE:  All right.  At

12   this point in time have your rights (inaudible)?

13        INMATE BOONE:  Yes, Sir.

14        PRESIDING COMMISSIONER LEE:  Okay.  You have

15   the right to be heard by an impartial Panel.  Do

16   you have any objections to the Panel at this time?

17        INMATE BOONE:  No, Sir.

18        PRESIDING COMMISSIONER LEE:  Okay.  You will

19   receive a copy of our written tentative decision

20   today.  The decision becomes effective within 120

21   days.  A copy of the decision and a copy of the

22   transcript will be sent to you.  Pursuant to

23   administrative decision 04 dash 01 you have the

24   right to a grievance -- to file a grievance if you

25   believe it's appropriate.  If not, then you can

26   file any other issues with the trial court.

27   Deputy -- is there any confidential information

9

1    that we will be using today?

2         DEPUTY COMMISSIONER CATER:    No, there is

3    not.

4         PRESIDING COMMISSIONER LEE:    All right.

5    Sir, would you raise your hand.  Do you swear to

6    tell the truth, the whole truth and nothing but

7    the truth?

8         INMATE BOONE:    Yes, Sir.

9         PRESIDING COMMISSIONER LEE:    All right.  Now

10   I'm going to go to the facts of the case.   The

11   facts of the case are going to be taken from the

12   Board of Prison Terms report dated November 2004

13   beginning on page one, and this is the summary of

14   the crime.  All right.

15             "On April 18, 1986 29 Palms police

16              arrived at 7065 Alpine, 29 Palms, the

17              Boone residence, regarding a

18              disturbance.  Donald Boone and

19              Jeffrey Crane got into a physical

20              altercation.  Boone had been

21              stationed overseas with the Marine

22              Corps for the previous 12 months.  He

23              had returned unannounced at about

24              2115 hours to find his wife

25              (indiscernible) Boone in the arms of

26              Crane.  On April 21, 1986

27              (indiscernible) Boone obtained a

10

1    restraining order against Donald

2    Boone.   On April 24, 1986 Boone was

3    placed under citizen's arrest by

4    (indiscernible) Boone for violation

5    of that restraining order.   On

6    April 29, 1986 Boone received a

7    letter from the District Attorney's

8    Office indicating that a complaint

9    had been filed for disobeying a court

10    order and that he had an appearance

11    date of May 13, 1986.   On May 3, 1986

12    Boone shot his wife (indiscernible)

13    twice in the chest with a .12 gauge

14    shotgun and then telephoned Brett

15    (indiscernible) and Thomas Pulp

16    (phonetic) and told them he had just

17    shot his wife.   Boone then left a

18    suicide note and shot himself in the

19    chest."

20    Obviously, sir, you survived that wound.

21         **INMATE BOONE:**  Yes, Sir.

22         **PRESIDING COMMISSIONER LEE:**  Now you have a

23    right not to discuss the facts of the case with

24    us.

25         **INMATE BOONE:**  (Inaudible).

26         **PRESIDING COMMISSIONER LEE:**  It's totally up

27    to you if you wish to do that or not.   So would

11

1    you like to discuss the facts with the -- of the

2    case with us or would like us to go on to other

3    areas?

4           **INMATE BOONE:**  No, I'll discuss the case.

5           **PRESIDING COMMISSIONER LEE:**  All right.

6    Mr. Boone, this occurred 20 years ago or almost 20

7    years ago.

8           **INMATE BOONE:**  Yes, Sir.

9           **PRESIDING COMMISSIONER LEE:**  And basically

10   you had a lot of time to think.  Is there anything

11   you'd like to tell the Panel at this time?

12          **INMATE BOONE:**  Yes, Sir.  I regret it ever

13   since that I've done it -- what I did, taking my

14   wife's life.  Regardless of anything that was

15   going on at the time, she didn't deserve to be

16   killed.  It was a selfish act on my part.  I acted

17   out in a violent matter being I didn't at that

18   time have the ability to see past what was going

19   on at the present time.  And I took my wife's life

20   and I regret doing so and I feel remorse for

21   taking her life.  She's missed out on a lot.  I've

22   already lived 10 years past the age that my wife

23   was when she died, 11 years actually.  She'd just

24   turned 40 and I just turned 51.  She had a right

25   to live her life however or with whomever she

26   wanted to live with.

27          **PRESIDING COMMISSIONER LEE:**  All right.  Let

12

1    me ask you a question, sir, because obviously one

2    would suspect that this is a crime of passion.

3    When you arrived home on -- I believe it's April

4    18, 1986 I believe it is --

5        INMATE BOONE:  Yes, Sir.

6        PRESIDING COMMISSIONER LEE:  -- unannounced,

7    did you have any idea what was going on?

8        INMATE BOONE:  No, Sir, I just walked right

9    in and --

10       PRESIDING COMMISSIONER LEE:  So you were

11   totally (inaudible)?

12       INMATE BOONE:  Yes, Sir.

13       PRESIDING COMMISSIONER LEE:  Now when did

14   you first meet your wife?

15       INMATE BOONE:  September 15, 1975.

16       PRESIDING COMMISSIONER LEE:  So you knew her

17   at least up until this time for about (inaudible)

18   years?

19       INMATE BOONE:  Yes, Sir.

20       PRESIDING COMMISSIONER LEE:  (Inaudible) and

21   you met her overseas?

22       INMATE BOONE:  No, Sir.  I met her when I

23   was stationed in Norfolk, Virginia.

24       PRESIDING COMMISSIONER LEE:  Now you have

25   children from this marriage.

26       INMATE BOONE:  Yes, Sir.  One daughter.

27       PRESIDING COMMISSIONER LEE:  Okay.  When did

13

1   you get married?

2        INMATE BOONE: November 19, 1978.

3        PRESIDING COMMISSIONER LEE: November what?

4        INMATE BOONE: Nineteen.

5        PRESIDING COMMISSIONER LEE: Nineteen

6   seventy-eight?

7        INMATE BOONE: Yes, Sir.

8        PRESIDING COMMISSIONER LEE: So at this time

9   she was eight-years-old?

10        INMATE BOONE: She was seven; she'd just

11   turned seven the second of April.

12        PRESIDING COMMISSIONER LEE: All right. Now

13   you come home and you absolutely have no idea this

14   is going on. Did you know Mr. Crane?

15        INMATE BOONE: No, Sir. Never saw him

16   before.

17        PRESIDING COMMISSIONER LEE: All right. He

18   was obviously in your house at the time.

19        INMATE BOONE: Yes, Sir.

20        PRESIDING COMMISSIONER LEE: All right. And

21   that was the original altercation?

22        INMATE BOONE: Yes, Sir.

23        PRESIDING COMMISSIONER LEE: Now, not that

24   it would make an excuse, but at that point in time

25   when you had the first altercation with him, you

26   were surprised, etcetera, etcetera, did you at

27   some point in time realize that this relationship

14

1    wasn't going to go any further?

2            INMATE BOONE:  Mine or --

3            PRESIDING COMMISSIONER LEE:  Your

4    relationship with your wife.

5            INMATE BOONE:  No, not at that time I didn't

6    know.  I didn't know how long or what had been

7    going on for the time that I was gone because

8    everything was a complete surprise to me when I

9    came home.

10           PRESIDING COMMISSIONER LEE:  All right.  And

11   when you found out what had been going on -- or

12   how did you find out what had been going on other

13   than just observing?  Did you talk to your wife?

14   Did you find out from other people?

15           INMATE BOONE:  Other people, my wife, my

16   daughter, friends of my wife and telephone calls

17   from Crane.

18           PRESIDING COMMISSIONER LEE:  They told you

19   what had been going on?

20           INMATE BOONE:  Yes, Sir.

21           PRESIDING COMMISSIONER LEE:  All right.  And

22   you said you had a telephone call from the victim,

23   I mean, yeah, the victim.

24           INMATE BOONE:  No, not from Crane, he was

25   phoning my residence.

26           PRESIDING COMMISSIONER LEE:  Oh, I see.

27   Okay.  You never talked to him?

15

1    **INMATE BOONE:**  No, the only time -- the only

2    conversation that we actually had was -- in person

3    -- was when I walked home -- when I walked in the

4    front door and he was laying partially on top of my

5    wife and he looked up and he asked me who the fuck

6    are you?

7    **PRESIDING COMMISSIONER LEE:**  All right.  So

8    you got into an altercation with him at that point

9    in time and did you ever have an opportunity to talk

10    to your wife?

11    **INMATE BOONE:**  Yes, Sir.

12    **PRESIDING COMMISSIONER LEE:**  And she

13    explained to you that obviously she was involved

14    with another person.

15    **INMATE BOONE:**  She didn't say involved, she

16    just said that she had just met him.  And like I

17    said, I didn't know what his name -- I'd never met

18    him before.  I asked what his name was and she

19    told me, Jeff.  I said, what's his last name?  She

20    told me she didn't know what his last name was.

21    **PRESIDING COMMISSIONER LEE:**  And did you

22    ever have any further discussions with her before

23    the May '86 --

24    **INMATE BOONE:**  Yes, Sir.  We talked on

25    several occasions.  And she was given indications

26    that -- at least in my eyes -- that things were --

27    going to try -- we're going to try to work things

16

1    out between her and I.   And I told her I didn't

2    really care what had been going on for the time

3    that I was gone, that I loved her and I had been

4    waiting a whole year to come home to see her and

5    be with her and my daughter.   And there were

6    indications from her and from Crane also, he had

7    written down that he was afraid -- because he saw

8    my wife and me together on several different

9    occasions -- that he was afraid that we had made

10   the choice to stay together, that was one of his

11   concerns.

12        PRESIDING COMMISSIONER LEE:   Okay.   So when

13   did it break down?

14        INMATE BOONE:   I think it was a -- it was a

15   combination -- it was just something that was

16   building up.   It just didn't stop from the night

17   that I came home, it just continued for a two-week

18   period of just talking to different people and

19   they were telling me one thing, my wife was

20   telling me another thing along with telling me

21   that, yeah, okay, everything is going to be okay.

22   But then she's telling other people different.

23        PRESIDING COMMISSIONER LEE:   Well tell us

24   (inaudible) saying because this is your hearing,

25   sir.

26        INMATE BOONE:   She was actually bragging to

27   other people -- with other people about her

17

1    relationship with Crane and what it was doing to

2    me, that it really had upset me.  She just didn't

3    seem to care how I felt about finding her with

4    somebody.

5        **PRESIDING COMMISSIONER LEE:**  So you

6    basically were getting mixed messages from her?

7        **INMATE BOONE:**  Yes, Sir.

8        **PRESIDING COMMISSIONER LEE:**  And at this

9    point in time when did you decide that you --

10    well, strike that.  When did you -- When did you

11    get involved in the situation with the restraining

12    order, well, the circumstances in regards to that?

13        **INMATE BOONE:**  I didn't -- I didn't even know

14    about the restraining order, probably seven days.

15    It wasn't within -- It wasn't within a few days.  It

16    was longer than -- I would say between seven and 10

17    days.  I didn't have any idea about a restraining

18    order or anything.  That was something that came up

19    later on after I got home with the restraining

20    order.

21        **PRESIDING COMMISSIONER LEE:**  You mean, you

22    didn't have a fight and she told -- she told you to

23    (inaudible)?

24        **INMATE BOONE:**  No.

25        **PRESIDING COMMISSIONER LEE:**  Nothing like

26    that?

27        **INMATE BOONE:**  No.  No, Sir.  No, that didn't

18

1    even come up until well after I got home.

2         **PRESIDING COMMISSIONER LEE:**   Okay.   And when

3    you -- When I guess you found out, how did you find

4    out about this restraining order?

5         **INMATE BOONE:**   I went to -- She was at

6    (indiscernible) Flores's residence, it was a friend

7    of hers, and Heather, my daughter, was there.   And

8    when I tried to stop and see Heather, that was when

9    my wife called the police, the 29 Palms Sheriff's

10   Office, and I was arrested at Flores's residence.

11   That's when -- I knew then when they said I was in

12   violation of a restraining order.   I said, what

13   restraining order?  Because I hadn't even been

14   served with anything.

15        **PRESIDING COMMISSIONER LEE:**   Okay.   And what

16   was the next time you got into contact with your

17   wife?

18        **INMATE BOONE:**   Actually we never stopped

19   having contact.   I had spoken to her about the

20   restraining order and I remained at the house.   She

21   wasn't calling the police or anything.   The only one

22   that was calling the police or the sheriff's

23   department and the CHP was Crane.   My wife, after

24   that day, I had sat down with her and I said, look,

25   I have been away for a year.   I love you.   I want to

26   try to get things back together.   I want to see you

27   and I want to spend time with Heather, and my

19

1  daughter had wanted to spend time with me.  So

2  that's basically where we were at at that point, but

3  at one time -- it was during the afternoon my wife

4  and I were sitting out front -- out front of the

5  house and Crane drove by on the street in front of

6  -- like on the side of our house.  And she said,

7  he's going to call -- he's going to call the police.

8  So I jumped on a bike.  She said, you'd better leave

9  because he's going to call the police.  So I jumped

10  on a bike.  I rode over one street.  I saw the

11  sheriff's deputies pull up and a CHP unit.  They

12  were there just a matter of minutes.  When they

13  left, I sent back home and just carried on our

14  conversation.

15        PRESIDING COMMISSIONER LEE:  Well, now that

16  you're finding out that your wife is saying one

17  thing and doing another, there's just no question

18  that -- based upon reports in your file -- that

19  Mr. Crane stayed in the picture and it was obviously

20  at the permission of your wife.  When did -- Well,

21  you had a date set for May 13 for --

22        INMATE BOONE:  Yes, Sir.

23        PRESIDING COMMISSIONER LEE:  -- trial, I

24  mean for -- excuse me -- arraignment.

25        INMATE BOONE:  Yes, Sir.

26        PRESIDING COMMISSIONER LEE:  And then you

27  basically decided on May 3 to do this.

20

1          **INMATE BOONE:**  Yes, Sir.

2          **PRESIDING COMMISSIONER LEE:**  What got you to

3      that point?

4          **INMATE BOONE:**  I'd taken her to work.

5      Stopped at a friend of mine's house that was --

6      that I'd worked with at 29 Palms and I talked with

7      him for a while, went home, put a tetherball up

8      for my daughter.  And she wanted to play with it

9      right away, but I said, no, we have to let the

10     pole set in the cement for a day.  So after I was

11     done with that, we went in and had some lunch.

12     And shortly after that is when my wife called from

13     the commissary.  She says, I'll fuck anybody I

14     want to fuck and there's nothing you can do about

15     it, and I'm taking Heather.  You're not going to

16     see her.  I'm taking everything.  And that's --

17         **PRESIDING COMMISSIONER LEE:**  How did that

18     conversation come about?  I mean, it sounds very

19     --

20         **INMATE BOONE:**  Crane had called her at work

21     and he had called me probably about one o'clock

22     that morning.  On Saturday morning he had called

23     my residence and basically he was pretty upset

24     that I was still in the house.  He said --

25     threatening me that he would kill all of us in the

26     house, that he didn't care, because he knew where

27     the shotgun was.  And I told him then my wife and

21

1   I are getting things worked out, you're not in the

2   picture anymore, stop calling, don't try to

3   contact her, don't try to contact my stepdaughter,

4   don't go to see her at work. He just kept up at

5   it, and when she went to work that morning he

6   called her that morning at work, at the

7   commissary.

8          PRESIDING COMMISSIONER LEE:  Obviously your

9   wife was more concerned about him than you.  Now

10  you said stepdaughter or your daughter?

11         INMATE BOONE:  My stepdaughter.  I had a

12  stepdaughter living there too, Helen, and my

13  daughter is Heather.

14         PRESIDING COMMISSIONER LEE:  Okay.  So Helen

15  is older?

16         INMATE BOONE:  Yes, Sir.  She was 18 at the

17  time.

18         PRESIDING COMMISSIONER LEE:  And this is

19  from your wife's earlier marriage?

20         INMATE BOONE:  Yes, Sir.

21         PRESIDING COMMISSIONER LEE:  And at this

22  point in time, okay, then you've -- you're quite

23  upset because she has now indicated what she's

24  going to do.

25         INMATE BOONE:  Yes, Sir.

26         PRESIDING COMMISSIONER LEE:  And then that's

27  when you decided to do this?

22

1      INMATE BOONE:  Yes, Sir.

2      PRESIDING COMMISSIONER LEE:  All right.

3  Well if everything had gone the way you

4  anticipated, you wouldn't be here today.

5      INMATE BOONE:  Yes, Sir.  Or if I hadn't of

6  done it, if I'd just walked away I wouldn't be

7  here today.

8      PRESIDING COMMISSIONER LEE:  That's true

9  too.

10      INMATE BOONE:  I would have been retired

11  from the Marine Corps (inaudible) been able to see

12  my daughter and granddaughter.

13      PRESIDING COMMISSIONER LEE:  Do you ever see

14  either one, either your daughter or your

15  stepdaughter anymore?

16      INMATE BOONE:  My daughter, yeah, I'm in

17  contact with her.  I have pictures of her and my

18  granddaughter.

19      PRESIDING COMMISSIONER LEE:  And where are

20  they living?

21      INMATE BOONE:  New Jersey with my family.

22  My daughter works with my sister.

23      PRESIDING COMMISSIONER LEE:  Okay.  So she's

24  with your family?

25      INMATE BOONE:  Yes, Sir.

26      PRESIDING COMMISSIONER LEE:  All right.  I'm

27  going to go into your social life right now.  In

23

1   regards to juvenile record you have none.  You

2   have nothing other than this conviction.

3          **INMATE BOONE:**  Yes, Sir.

4          **PRESIDING COMMISSIONER LEE:**  As far as

5   personal -- your personal information, you're the

6   eldest of four children.  You were born on

7   April 20, 1954, that makes you 50-years-old, in

8   Minneapolis, Minnesota where your father was

9   stationed while serving in the U.S. Navy.  When

10  you were a few months old, the family returned to

11  Gibson, New Jersey.  You stated that this is where

12  your younger siblings were born and they were all

13  raised and graduated from high school in that

14  community.

15          "There were no family conflicts or

16           contacts with juvenile authorities.

17           Two weeks after he graduated from

18           high school -- he, meaning you of

19           course -- enlisted in the Marine

20           Corps.  Met his wife in Norfolk,

21           Virginia.  When he was transferred to

22           California, she followed him and they

23           were married on November 19, 1977."

24          **INMATE BOONE:**  (Inaudible).

25          **PRESIDING COMMISSIONER LEE:**  What was that?

26          **INMATE BOONE:**  I was (inaudible) --

27          **PRESIDING COMMISSIONER LEE:**  Is it wrong?

24

1        **INMATE BOONE:** -- about the date.

2        **PRESIDING COMMISSIONER LEE:**

3              "(Inaudible) when he was transferred

4              to Okinawa in 1978, she went to live

5              with his parents in New Jersey. She

6              left his parents' home and returned

7              to Norfolk, Virginia. When Boone

8              returned, they reunited. At this

9              time he suspected that there may have

10             been extramarital affairs. He went

11             overseas to Japan and upon his return

12             he walked in on another man in his

13             home. In spite of her infidelity he

14             attempted to keep the marriage and

15             family together."

16   I asked you earlier, sir, whether or not you knew

17   of any problems or whether you were surprised at

18   what you found when you came home. Based upon

19   that statement --

20        **INMATE BOONE:** Yes, Sir.

21        **PRESIDING COMMISSIONER LEE:** -- it indicates

22   that you did know something was going on or at

23   least you suspected. Can you answer that?

24        **INMATE BOONE:** I didn't have any -- there

25   was no -- I'd never seen her with anybody. I'd

26   never -- I just had -- reason why she left my

27   parents' house because at the time she was pregnant

25

1   with Heather and as far as I knew we were going --
2   she was going to stay upstairs in the apartment
3   with my mom -- where my mom and dad could help her
4   out if she needed anything.  And I was just -- I
5   knew that -- I knew Kim that my wife had known
6   when we lived in Virginia and I think she knew her
7   in Florida too -- she was living with Kim and her
8   husband Ron Wheeler.  So I was kind of suspicious
9   as to why she would leave a residence right above
10  my parents and drive five hours to Virginia only
11  to come back when she'd go to see the gynecologist
12  or -- help her with the pregnancy.  So I just kind
13  of brushed it aside and didn't mention anything
14  more about it.

15        PRESIDING COMMISSIONER LEE:  All right.
16  Let's see (inaudible) just a second.  Before I go
17  into your parole plans, I'm going to turn this
18  over to the Commissioner and have the Commissioner
19  at this time discuss your activities while
20  incarcerated.

21        DEPUTY COMMISSIONER CATER:  Mr. Boone, I'm
22  going to review the post-conviction factors.  You
23  last had a hearing in November of 2003.  So the
24  bulk of my remarks and observations are going to
25  be focused on that timeframe.

26        INMATE BOONE:  Okay.

27        DEPUTY COMMISSIONER CATER:  There will be

26

1   some acknowledgement of some other successes

2   and/or problem areas outside that timeframe.

3          **INMATE BOONE:** Right.

4          **DEPUTY COMMISSIONER CATER:** And once I

5   conclude, then you'll have the opportunity to

6   clarify anything I've covered, or if you feel

7   there have been some gaps or omissions, you'll

8   have an opportunity to fill those in.  Okay.

9          **INMATE BOONE:** Yes, Sir.

10         **DEPUTY COMMISSIONER CATER:** Additionally, as

11  I go through this you can anticipate me asking you

12  a few question to tie up whatever loose ends there

13  may be at this time.

14         **INMATE BOONE:** Okay.

15         **DEPUTY COMMISSIONER CATER:** The record

16  reflects that Mr. Boone arrived at this

17  institution in March of 1997.  As indicated, his

18  last actual hearing before a BPT Panel was held in

19  November of 2003.  At that time the Panel denied

20  parole for a period of one year, recommended that

21  he remain or become disciplinary-free and that he

22  seek self-help as available.  It is acknowledged

23  that he has not received any disciplinary action

24  since that hearing.  In fact, his only CDC 115 was

25  in October of 2002 when he refused a move or

26  relocation of his cell assignment.  As far as

27  custodial counseling chronos he's amassed only two

27

1    during his prison stay, and the last one was being

2    late to an assignment back in May of 1993.

3    Mr. Boone's classification score has been at zero

4    since October of 1993. His placement score, which

5    is the minimum you can achieve as a lifer, is

6    noted as being 19. His custody level is Medium A.

7    Information within the C-File reflects that his

8    current work assignment is through PIA as a

9    landscaper and painter, a job assignment he has

10   held since May of 2003. Mr. Boone is that still

11   current and accurate?

12        INMATE BOONE:  Yes, Sir.  The only -- I

13   noticed in there it said March of '97. I actually

14   got to Soledad in '93, but I want to Quentin for

15   several months for the Cat X program.

16        DEPUTY COMMISSIONER CATER:  So this was you

17   being returned then --

18        INMATE BOONE:  Yes, Sir.

19        DEPUTY COMMISSIONER CATER:  -- in March of

20   '97?

21        INMATE BOONE:  Yes, Sir, from the Cat X

22   program.

23        DEPUTY COMMISSIONER CATER:  All right.

24   There was also a very brief transfer of just a

25   couple of weeks fairly recently in this calendar

26   year, correct?

27        INMATE BOONE:  Yes, Sir.

28

1.        **DEPUTY COMMISSIONER CATER:** And what was the

2    purpose for that?

3.        **INMATE BOONE:** I had surgery. I'm just

4    assuming that's the one you're talking about, to

5    Corcoran, yeah, to Corcoran.

6        **DEPUTY COMMISSIONER CATER:** Yeah.

7.        **INMATE BOONE:** Yes, Sir.

8        **DEPUTY COMMISSIONER CATER:** I believe it was

9    a March 24, '05 return to CTF.

10        **INMATE BOONE:** Yes, Sir.

11        **DEPUTY COMMISSIONER CATER:** Okay. Why don't

12    you elaborate about the surgery, what was going on

13    there?

14        **INMATE BOONE:** Ten months ago I had went to

15    Corcoran for surgery for a hernia, and even before

16    I left the hospital it didn't feel right but I

17    figured it was still in the healing stages. So I

18    came back to Soledad and several months later

19    noticed that the bulge was starting to reappear so

20    I went to see a doctor and he confirmed that I had

21    another hernia. And I waited several months to be

22    transported to Corcoran so another doctor could

23    look at me which he also confirmed that I had

24    another hernia. And a few months after that they

25    transported me back to Corcoran for the surgery

26    once again. It seems to be pretty successful so

27    far.

29

1          **DEPUTY COMMISSIONER CATER:** And that actual

2    surgery then was just a few weeks ago, correct?

3          **INMATE BOONE:** Yes, Sir.

4          **DEPUTY COMMISSIONER CATER:** All right. To

5    continue, work reports available for our review,

6    the most recent one was dated November of 2004,

7    gave Mr. Boone exceptional to above average

8    ratings. There was an earlier one from July of

9    '03, they gave him exceptional to above average

10   ratings in that work assignment. Testing done

11   within the institutional setting back in 1999

12   reflects a GPL of 12.9. Up until April of 2003

13   Mr. Boone was assigned to vocational landscaping.

14   Why did that end, Mr. Boone?

15         **INMATE BOONE:** I went from north over to

16   east dorm.

17         **DEPUTY COMMISSIONER CATER:** Where it was no

18   longer available to you?

19         **INMATE BOONE:** Landscaping?

20         **DEPUTY COMMISSIONER CATER:** Let me go back

21   to my first question. You were in vocational

22   landscaping up until April of '03.

23         **INMATE BOONE:** Yes, Sir.

24         **DEPUTY COMMISSIONER CATER:** Why did that

25   end?

26         **INMATE BOONE:** I came to east dorm. I got

27   put on the list and moved over to east dorm.

30

1    There was a lot of problems at north and I just

2    wanted to get away from that.  It wasn't

3    beneficiary to be at north any longer.

4         **DEPUTY COMMISSIONER CATER:**  Okay.  You'll

5    need to give me a little better education here.

6    Did moving to the east dorm preclude your access

7    to vocational landscaping?

8         **INMATE BOONE:**  No, Sir.  Oh, yeah, I can't

9    --

10         **DEPUTY COMMISSIONER CATER:**  I'm missing

11    something here.

12         **INMATE BOONE:**  Yes, I can't -- from over

13    here I can't go over to north to participate in

14    landscaping.

15         **DEPUTY COMMISSIONER CATER:**  Okay.  So you

16    being relocated was an impediment to finishing

17    with vocational landscaping?

18         **INMATE BOONE:**  Well, I got back into --

19    that's what I'm doing over here now.  East dorm is

20    landscaping.  I'm back in -- I'm in that now,

21    right now.

22         **DEPUTY COMMISSIONER CATER:**  Okay.  Then I

23    need some more information.  Is PIA landscape and

24    painter synonymous with vocational landscaping?

25         **INMATE BOONE:**  No, because I see the

26    instructor but I don't go over there.  Or if need

27    anything, flowers or anything like that, then I

31

1    can get them from him as he's done in the past.

2    But as far as me going over there and

3    participating in his class, no, Sir.  Yeah, that

4    doesn't happen anymore.

5        **DEPUTY COMMISSIONER CATER:**  All right.  So

6    one more related question at the risk of beating

7    this to death.  Can you secure a vocational

8    certification in landscaping continuing in the

9    role you're in right now?

10        **INMATE BOONE:**  No, Sir.

11        **DEPUTY COMMISSIONER CATER:**  All right.

12    Thank you.  The file also reflects some vocational

13    training, not to be confused with certifications,

14    in voc welding and small engine repair.  With

15    regard to those two, is there a possibility of you

16    continuing in either welding or small engine

17    repair to secure vocational certifications?

18        **INMATE BOONE:**  I'm taking a test for small

19    engines on Friday from a national organization.  The

20    instructor notified me and asked me if I would like

21    to take that test and I told him that I would.  So

22    that's with the Equipment And Training Council, they

23    offer a test.  It's 150 questions and it's a

24    two-hour limit.  I went over there last Friday and

25    we had a review of the test and I'm going Friday to

26    take the actual test for small engines, you know,

27    lawnmowers and things of that nature.

32

1          **DEPUTY COMMISSIONER CATER:** And will that

2   give you a certification or what will be the end

3   result if you're --

4          **INMATE BOONE:** Yes, Sir, it's (inaudible) --

5          **DEPUTY COMMISSIONER CATER:** -- successful?

6          **INMATE BOONE:** -- certification. Yes, Sir.

7   It's about the same as -- I don't know if you ever

8   heard of Automotive Service Excellence because

9   I've been certified in that before too. But it's

10  along the same lines as that.

11         **DEPUTY COMMISSIONER CATER:** All right.

12  Thank you. As to self-help programming the file

13  reflects some recent video instructions related to

14  community reentry. One chrono is dated

15  September '04 and the other reflects three hours

16  of video training and that's October of 2003.

17         **INMATE BOONE:** Yes, Sir.

18         **DEPUTY COMMISSIONER CATER:** There's also a

19  chrono dated December of 2003 about your

20  cooperation and participation in a fundraiser

21  called Operation Courage. I noted, preparing for

22  this hearing and presentation, Mr. Boone, and with

23  the obvious plan to represent yourself, is there a

24  reason you declined to review your C-File in March

25  of 2005?

26         **INMATE BOONE:** I'd reviewed it several times

27  and I knew that there wasn't anything else in

33

1    there that would be a surprise to me so I didn't

2    feel the need to review it.

3         **DEPUTY COMMISSIONER CATER:**  All right.

4    Thank you.  I'm going to go now to the Board

5    report we have in our packet for review and

6    consideration at this time prepared in October of

7    2004 by Correctional Counselor Peabody,

8    P-E-A-B-O-D-Y, specific to post-conviction factors

9    which begins under roman numeral three of that

10   report.  And this is where -- one of the two

11   places I saw the date of March 5, '97 to present

12   being at CTF but this does confirm that for a

13   period of time in both '96 on through '97 that was

14   when you were at San Quentin as you've already

15   shared with us.

16        **INMATE BOONE:**  Yes, Sir.

17        **DEPUTY COMMISSIONER CATER:**  This goes on to

18   indicate that the inmate completed the vocational

19   office machine repair course at CMC back in 1990,

20   also completed the auto shop program in November

21   of 1991 and qualified for certification by the

22   National Institution for Automotive Excellence in

23   brake and engine repair and engine performance in

24   December of 1991.  He completed the vocational

25   small engine repair at CTF in 1998.  Now that's

26   not consistent with my review because I was in

27   search of something that said certified in small

34

1    engine repair.  Is this a mistake or have I

2    misunderstood something?

3          INMATE BOONE:  That is a certification or

4    certificate of completion from small engines.

5          DEPUTY COMMISSIONER CATER:  There are

6    numerous documents in the C-File that touches on a

7    wide variety of small engine units or classes.

8          INMATE BOONE:  Yes, Sir.  Yes, Sir.

9          DEPUTY COMMISSIONER CATER:  Two stroke,

10   motorcycle, clutch adjustment and so forth.

11         INMATE BOONE:  Yes, Sir.

12         DEPUTY COMMISSIONER CATER:  What I did not

13   find was a certification that it was completed.

14   It's your statement today that it was in fact

15   completed and this is a true statement?

16         INMATE BOONE:  Yes, Sir.  I did complete

17   small engines.

18         DEPUTY COMMISSIONER CATER:  In your previous

19   review of the C-File did you find such a document

20   that --

21         INMATE BOONE:  Yes, Sir.

22         DEPUTY COMMISSIONER CATER:  -- affirms your

23   --

24         INMATE BOONE:  It's in there because I have

25   a copy here.

26         DEPUTY COMMISSIONER CATER:  All right.  Well

27   I'll endeavor to find it.  It's always possible --

35

1    There's plenty of papers in which -- other papers

2    to hide, so I'll go back and take another look.

3         **INMATE BOONE:**  Okay.

4         **DEPUTY COMMISSIONER CATER:**  But this

5    statement of the counselor reflects it was

6    completed.

7         **INMATE BOONE:**  Yes, Sir.

8         **DEPUTY COMMISSIONER CATER:**  Now as far as

9    other self-help activities and therapy there's

10    three paragraphs here under roman numeral three,

11    subsection C that succinctly captures what's

12    transpired since your incarceration.  This expands

13    far beyond the timeframe we're focusing on.

14    Nevertheless, I'm going to go ahead and

15    incorporate it here and touch upon these various

16    accomplishments and therapies you've participated

17    in.  It indicates that you were in a therapy group

18    at CMC east from February '98 until August of '88,

19    that's must be a typo on the '98 or a typo on the

20    '88.  Which was it?  Probably '88.

21         **INMATE BOONE:**  Eighty-eight.

22         **DEPUTY COMMISSIONER CATER:**  Also completed a

23    12-week Anger Control course in December of 1990,

24    completed Irrational Behavior Therapy group in

25    December of 1991.  Voluntarily participated in a

26    psychological research project, participated in

27    another Anger Control group from January '92

36

1    through March of '92.  Completed an eight-week

2    Reality And Decision Making therapy group on

3    December 17, 1992.  Additionally, while at CTF,

4    completed a 10-week Life Skills program in 1995,

5    four hours on the Cause, Prevention And Treatment

6    And Management Of TB in 1998.  Also this includes

7    hepatitis, HIV, AIDS and sexually transmitted

8    diseases, the last one completed in October of

9    2000.  Mr. Boone also receives credit for

10   completing the requirements for a self-help chrono

11   in May of 2003 by reading an appropriate book

12   about The Recovery Of The Person as well as

13   writing a report to the supervising psychologist

14   on what he had learned.  The counselor goes on to

15   indicate that during the period of time since the

16   last hearing:  "Boone's behavior has remained the

17   same and he's remained disciplinary-free with a

18   fulltime assignment that offers vocational

19   utility.  The self-help program participation

20   requested by the last BPT Panel is not available

21   at this facility."  It makes reference to

22   Mr. Boone having -- is prepared to start in a new

23   program at CTF called the Veterans Group but there

24   was -- at the time of this writing that was

25   pending awaiting the receipt of the DD214 to

26   confirm eligibility.  Mr. Boone, did that arrive?

27   And have you entered --