# EXHIBIT 4
# Part 2 of 2

37

1          **INMATE BOONE:** Yes, Sir.

2          **DEPUTY COMMISSIONER CATER:** -- this group?

3          **INMATE BOONE:** Yes, Sir. I'm in it now,

4     yes, Sir.

5          **DEPUTY COMMISSIONER CATER:** Can you share

6     with us what this Veterans Group is about, what

7     you're getting out of it, what your role is?

8          **INMATE BOONE:** We open the meeting by having

9     a moment of silence for the men and women that are

10    overseas and fighting in Iraq and Afghanistan. We

11    talk about the effects that being in prison have

12    had on us. And a lot of the guys that are in this

13    I've known over the years so I've had an

14    opportunity to talk with them about being in the

15    military and the comraderie that we shared. The

16    group is just basically getting off the ground

17    right now. We've only had -- I've only attended

18    four meetings myself. And we have it the last

19    Thursday of every month. We just had a sale, a

20    Subway sandwich sale. We're not sure what is

21    going to be done yet with the money. That has to

22    be voted on. But we talk amongst each other, and

23    if, you know, anybody needs any help, then --

24    we're trying to get people right now together that

25    can help give us information on what will be

26    available to us upon our release where they can

27    actually come into the meeting and give us some

38

1  information and try to help us at little bit.

2        **DEPUTY COMMISSIONER CATER:**  Are you there to

3  help others or to receive help from others?

4        **INMATE BOONE:**  I can get and give it.  It's

5  a two-way street.

6        **DEPUTY COMMISSIONER CATER:**  And this is

7  restricted to veterans?

8        **INMATE BOONE:**  Yes, Sir.

9        **DEPUTY COMMISSIONER CATER:**  Is it restricted

10  as well to lifers only?

11        **INMATE BOONE:**  No, Sir, there's non-lifers

12  in there too.

13        **DEPUTY COMMISSIONER CATER:**  Thank you.  I'm

14  going to go now to the psychiatric report prepared

15  for our consideration.  This psychological

16  evaluation is dated November 1, 2004.  Roman

17  numeral 12 of this report covers the clinical

18  assessment, and it was prepared by Dr. Stack,

19  S-T-A-C-K, he's a clinical psychologist at CTF.

20  Herein it describes Boone as being appropriate,

21  coherent, cooperative, calm and alert at the time

22  of interview.  His thought and affect were all

23  within normal range.  His intellectual functioning

24  was estimated to be in the average to above

25  average range.  There was no evidence, according

26  to the clinician, of a thought or mood disorder.

27  The doctor went on to reflect in this report that

39

1    the inmate's judgment appeared to be sound, that

2    he showed insight into his commitment offense.  As

3    to the current diagnostic impressions, under

4    Axis I there were no clinical disorders, under

5    Axis II no personality disorder and Axis V

6    reflects a GAF score of 90.  The clinician offers

7    that the prognosis here is positive for being able

8    to maintain the inmate's current -- just a moment.

9         [Thereupon, the tape was turned over.]

10        **DEPUTY COMMISSIONER CATER:**  Dr. Stack goes

11   on to say that the prognosis is positive for being

12   able to maintain his current mental state in the

13   community upon parole.  Under roman numeral 14 of

14   this report, which is on page three, there's an

15   assessment of dangerousness offered by Dr. Stack.

16   In the doctor's opinion in a controlled setting

17   the violence potential is estimated to be

18   (inaudible) below average relative to this Level

19   II inmate population.  The doctor points out that

20   there has been only one CDC 115 during the

21   duration of his incarceration for a rule violation

22   as to his refusing to move.  The doctor further

23   elaborates -- references that CDC 115 pointing out

24   that it was not for any violent behavior and

25   offers it was an attempt to avoid a violent

26   confrontation with the inmates living in the

27   dormitory.  It attributes that remark, however, to

40

1    the inmate.    On the other hand, the doctor

2    continues:

3              "Inmate Boone's lack of any criminal

4              history, lack of any CDC 115's for

5              violence and also a complete absence

6              of 128's for any violent, aggressive

7              or defiant behavior indicates his

8              violence potential within a

9              controlled setting remains

10             significantly below average.    If

11             released, it's the opinion of this

12             clinician that the violence potential

13             demonstrated by Mr. Boone is

14             estimated to be no more than the

15             average citizen in the community."

16    The doctor goes on to point out that:

17             "This assessment echoes the

18             conclusions of Dr. Terrini,

19             T-E-R-R-I-N-I, as reflected in his

20             Board report in the year 2000."    In

21             closing Dr. Stack offers:    "There are

22             no significant risk factors for this

23             inmate that would be precursors to

24             violence for this individual."

25    Boone in this report is reported as being

26    competent and responsible for his behavior and he

27    has the capacity to abide by institutional

41

1   standards and has done so.  In closing Dr. Stack

2   also indicates that the inmate does not have a

3   mental health disorder that would necessitate

4   treatment either during his incarceration or

5   following if released on parole.  The doctor also

6   points out that Boone does not have a significant

7   drug or alcohol problem and there are no

8   recommendations specific to that area.  And

9   finally Dr. Stack indicates it appears Boone is a

10  very good candidate for parole consideration and

11  agrees with Dr. Terrini's 2000 psychological

12  evaluation in this regard as well.  Now Mr. Boone,

13  now that I've concluded my overview, my remarks I

14  wanted to make as to post-conviction factors over

15  the last 15 months or so since your last hearing,

16  is there anything that you want to expound upon?

17  Are there any notable omissions that you feel

18  ought to be included?

19       **INMATE BOONE:**  No, I didn't notice any

20  omissions.  I'd just like to say that there were

21  three areas that were asked to be looked at and

22  Dr. Stack addressed the areas as far as my level

23  of dangerousness, whether I had a drug or alcohol

24  problem and whether or not I needed therapy.  But

25  she covered those three areas in the report.

26       **DEPUTY COMMISSIONER CATER:**  All right.

27  Thank you.  And you may want to touch upon that in

42

1    your closing remarks or just submit it at that

2    time.

3         INMATE BOONE:  Okay.

4         DEPUTY COMMISSIONER CATER:  We'll move now

5    to the continuing portion of our hearing.  Pardon

6    me, did you have anything additional you wanted to

7    add?

8         INMATE BOONE:  No, Sir.

9         DEPUTY COMMISSIONER CATER:  We'll move to

10   the continuing portion of our hearing and I return

11   to the Chair.

12        PRESIDING COMMISSIONER LEE:  All right.  At

13   this point in time we're going to go over your

14   parole plans.  However, I have some questions in

15   regards to what was discussed just recently.

16   There was this entire scenario with the 115.

17        INMATE BOONE:  Yes, Sir.

18        PRESIDING COMMISSIONER LEE:  You've never

19   picked up 115's before and you picked this

20   particular one up and it was a grave concern to

21   Commissioner Welch -- basically indicated that he

22   was -- he wished to or he contemplated granting

23   you a date --

24        INMATE BOONE:  Yes, Sir.

25        PRESIDING COMMISSIONER LEE:  -- however he

26   said with this 115 you would not pass the review

27   board.

43

1        **INMATE BOONE:**  Yes, Sir.

2        **PRESIDING COMMISSIONER LEE:**  And that -- He

3    indicated that you needed to distance yourself

4    from this 115.

5        **INMATE BOONE:**  Yes, Sir.

6        **PRESIDING COMMISSIONER LEE:**  From what I've

7    read and what I understand you had to make a

8    choice.  You had to make a choice of either going

9    to an area where you knew you were going to have a

10   lot of problems or you were going to get the 115.

11   How do you feel about making that decision?

12       **INMATE BOONE:**  I felt like I was in between

13   a rock and a hard spot.  I didn't want to get a

14   115 either way, but I knew that if I moved into

15   that dorm I was going to be confronted with

16   several individuals and I knew that -- I knew what

17   was going to happen.

18       **PRESIDING COMMISSIONER LEE:**  Well tell us, I

19   mean, this is your hearing (inaudible) want to be

20   able to put this in some context.

21       **INMATE BOONE:**  I was working in the chow

22   hall at the time, and like I say, north was in a

23   transition period.  We were locked down a lot.

24   The only people that were going to the chow hall

25   were the people that lived in the dorms.  The

26   people that lived in the cells weren't -- were

27   being cell fed.  The people that lived in the

44

1  north dorm had a bunch of young guys in there,

2  some skinheads.  They approached me one day, said

3  that I had to work on the side that they ate on.

4  Because there was two chow halls, one on the

5  right, one on the left and -- had a wall dividing

6  -- Now they ate in the chow hall on the left.  And

7  because they're white and because I'm white I

8  should work on that side of the chow hall.  They

9  also wanted me to give them extra food and if they

10  needed cigarettes I'm supposed to run and get them

11  cigarettes or do whatever they ask me to do.  And

12  I said, I work where the CO tells me to work,

13  nobody is getting any more food than anybody else

14  and I'm not chasing cigarettes down for anybody.

15  And they said, okay, we'll deal with it.  I know

16  what that means.  I know if I moved into that

17  dorm, I was getting my ass kicked.  There was no

18  question in my mind.  I didn't want to get a 115.

19  I didn't get a 115 the whole time I've been down.

20  I've been trying to -- I want to go home.  That

21  was the bottom line.  And my behavior has been a

22  model inmate.  I felt that if I moved into that

23  dorm I would be in a violent confrontation, I

24  would go to the hole and I would come in front of

25  the Board of Prison Terms again with a violent

26  incident.

27            PRESIDING COMMISSIONER LEE:  Okay.  So you

45

1    chose the lesser of two evils.

2              **INMATE BOONE:**  Yes, Sir.

3              **PRESIDING COMMISSIONER LEE:**  All right.   I

4    will indicate that that was apparently what the

5    Commissioner in the last hearing seemed to

6    indicate as well, that he believed that you had to

7    make a choice.   Unfortunately it will delay your

8    parole date.

9              **INMATE BOONE:**  Yes, Sir.

10             **PRESIDING COMMISSIONER LEE:**  But

11   nonetheless, I'm going to move on to some other

12   things at this point.   I have numerous letters.

13   These letters are from various individuals and I

14   will begin with -- I will begin with a friend of

15   yours.   This is an individual by the name of

16   Michael Benedict (phonetic), United States Marine

17   Corps, retired.   He has indicated that he has

18   known you since 1983.   That you were in the Marine

19   Corps together, stationed at 29 Palms, that

20   apparently you worked together in the military

21   traffic enforcement.   He feels obviously that you

22   were given bad legal advice and he thinks that you

23   would be a productive member of society.   There is

24   an uncle of yours and is -- well, both he and his

25   wife, Kenneth and Susan Hickman (phonetic), would

26   like you to be released.   They would also allow

27   you to stay in their house.   However, this is in

46

1  New Jersey.

2          **INMATE BOONE:**  Yes, Sir.

3          **PRESIDING COMMISSIONER LEE:**  There is

4  Michael Kalnas, K-A-L-N-A-S, also from the United

5  States Marine Corps.  He basically knows you from

6  quite a long time back.  I guess you guys grew up

7  together.

8          **INMATE BOONE:**  Yes, Sir.

9          **PRESIDING COMMISSIONER LEE:**  He also feels

10  that you are an individual worthy of release.

11          **INMATE BOONE:**  I have a picture too if you'd

12  like to see him.  I saw him this summer too.

13          **PRESIDING COMMISSIONER LEE:**  That's all

14  right.  You know, it might change my mind after

15  looking (inaudible).  All right.  There's somebody

16  by the name of -- anytime -- And you should know

17  this.  Anytime you have people submit letters of

18  recommendation, please have them have it type it

19  because --

20          **INMATE BOONE:**  (Inaudible).

21          **PRESIDING COMMISSIONER LEE:**  -- it's so

22  impossible to read handwriting.

23          **INMATE BOONE:**  Yes, Sir.

24          **PRESIDING COMMISSIONER LEE:**  Not because

25  their handwriting is bad, but the xerox machines

26  get worse and worse as time goes on.

27          **INMATE BOONE:**  Okay.

47

1      **PRESIDING COMMISSIONER LEE:**  But anyway,

2   there's somebody by the name of -- I think it's --

3   something Boone.

4      **INMATE BOONE:**  Brian.

5      **PRESIDING COMMISSIONER LEE:**  Brian.

6      **INMATE BOONE:**  My brother.

7      **PRESIDING COMMISSIONER LEE:**  Brian.  All

8   right.  Here is a -- I'll get to that in a second.

9   There is a Janet Lancaster and she apparently is

10  related to you through marriage I believe it is.

11     **INMATE BOONE:**  Yes, Sir.

12     **PRESIDING COMMISSIONER LEE:**  And she

13  basically says that you're not a hard-core

14  criminal.  I think your record indicates that.

15  There is Ms. Lancaster again, she likes writing

16  you letters.  And there's Hubert Lancaster, he

17  also is quite supportive.  In fact, he's the one

18  who basically feels that the 115 should not be

19  held against you.

20     **INMATE BOONE:**  Yes, Sir.

21     **PRESIDING COMMISSIONER LEE:**  There is a

22  Cheryl Joyce Kahar (phonetic).  Apparently you

23  must have impressed her.  She's 74-years-old.

24     **INMATE BOONE:**  Yes, Sir.

25     **PRESIDING COMMISSIONER LEE:**  And she

26  apparently believes that you could live right next

27  door to her.

48

1          **INMATE BOONE:**  I could live with her.

2          **PRESIDING COMMISSIONER LEE:**  Pardon me?

3          **INMATE BOONE:**  I could live with her if the

4    opportunity arises.  She would allow me to live

5    with her until I could get back to New Jersey.

6          **PRESIDING COMMISSIONER LEE:**  How do you know

7    her?

8          **INMATE BOONE:**  She came to see -- She's a

9    good friend with a guy's mother that I know here.

10   And rather than them travel alone, they've known

11   each other for like 50 years, so she would come

12   here to the prison with Ms. Walker.  And we got to

13   know each other that way and through letters and

14   stuff.

15         **PRESIDING COMMISSIONER LEE:**  Okay.  There is

16   a (indiscernible) Walker.

17         **INMATE BOONE:**  Doris.

18         **PRESIDING COMMISSIONER LEE:**  Doris.  Okay.

19   And Doris is also supportive.  She's an elderly

20   lady as well apparently.

21         **INMATE BOONE:**  Yes, Sir, she's 82 now.

22         **PRESIDING COMMISSIONER LEE:**  Well, now, I'm

23   not making fun of this, but I want to clarify

24   this.  You were younger than your wife, correct?

25         **INMATE BOONE:**  Yes, Sir.

26         **PRESIDING COMMISSIONER LEE:**  And apparently

27   the man she was having an affair -- was 20 years

49

1    younger than her?

2        **INMATE BOONE:**  Yes, Sir.

3        **PRESIDING COMMISSIONER LEE:**  All right.  Now

4    one thing that I wanted to clarify before I go to

5    the negatives is that there was a statement

6    apparently while you were in the hospital.  And

7    the statement basically discusses a concern that

8    you had apparently.  This is on -- if anybody

9    would like to take a look at it, it's County of

10   San Bernardino -- page three, dated May 3, 1986.

11   "Suspect Boone then made the spontaneous statement

12   saying, I've been away a whole year." This is the

13   continuation of some statements that you were

14   making.

15           "She was (indiscernible) years old

16           and this guy was 20-years-old, just

17           don't understand what she was doing,

18           nobody would help.  Base wouldn't

19           help because it was out in town.  The

20           sheriff wouldn't do anything, just

21           like I was the one she walked in and

22           caught.  I was willing to forgive and

23           forget, to do anything.  Something

24           like that just eats your mind away.

25           She wouldn't even budge an inch.  I

26           don't even have enough money to

27           afford a lawyer.  Why don't you just

50.

1          take me?  She didn't even have the

2          decency -- the decency not to do it

3          in front of my daughter.  Not the

4          doggone decency."

5     Now one would suspect that you were probably going

6     in and out of consciousness or something.

7          **INMATE BOONE:**  Sir, I didn't even realized I

8     said that until two years after I was gone -- I

9     didn't --

10         **PRESIDING COMMISSIONER LEE:**  Do you know

11    what you meant by that, I mean, what you were

12    saying?  Because I understand the first part, but

13    you apparently went to the sheriff's department

14    and you went to other people to try to help you?

15         **INMATE BOONE:**  Yes, Sir.

16         **PRESIDING COMMISSIONER LEE:**  In what regard?

17         **INMATE BOONE:**  I wanted to know if I had any

18    -- any way that they could possibly help me.  I had

19    talked to Lance Corporal Crane's commanding officer.

20    I don't even recall what his name is now.  They

21    assured me that Crane would not talk to my wife,

22    call my wife, ride by the house, call the house, try

23    to see my wife.  But when that didn't happen and I

24    called his CO and asked him for help again, he said,

25    what do you want me to do, be a watchdog?  And I

26    said, no, sir, I want you to be a man of your word

27    and help me like you said you would.  I need your

51

1   help because Crane will not leave us alone.

2       **PRESIDING COMMISSIONER LEE:**  Well I want to

3   get to that because it's one thing to have your wife

4   have an affair.

5       **INMATE BOONE:**  Yes, Sir.

6       **PRESIDING COMMISSIONER LEE:**  Unfortunately

7   it probably happens more oftentimes than we want

8   to know about.

9       **INMATE BOONE:**  Yes, Sir.

10      **PRESIDING COMMISSIONER LEE:**  But apparently

11  Mr. Crane sent you a letter --

12      **INMATE BOONE:**  Yes, Sir.

13      **PRESIDING COMMISSIONER LEE:**  -- indicated

14  his activities with your wife as well as five

15  other individuals who --

16      **INMATE BOONE:**  Yes, Sir.

17      **PRESIDING COMMISSIONER LEE:**  -- were

18  involved with your wife?

19      **INMATE BOONE:**  I didn't -- I didn't actually

20  see that.  I knew about it.  I didn't know

21  everything that was in it.  I didn't actually see

22  the letter again until after I was in prison.

23      **PRESIDING COMMISSIONER LEE:**  So that wasn't

24  taken into account when you were --

25      **INMATE BOONE:**  No, Sir.

26      **PRESIDING COMMISSIONER LEE:**  All right.

27  Anyway, at this point in time I'm going to turn

52

1    over to the Deputy District Attorney to ask any

2    questions that he feels the Panel should inquire

3    from you, sir.

4          **DEPUTY DISTRICT ATTORNEY WILSON:**  Yes.

5    Thank you, Commissioner.  If the Commissioner

6    could ask the inmate just a direct question, why

7    did he kill his wife?

8          **PRESIDING COMMISSIONER LEE:**  Sir, I guess

9    the Deputy District Attorney wants to hear it from

10   your mouth.  I think all the men this room

11   probably understand to some degree how you felt,

12   but can you articulate how you felt?

13         **INMATE BOONE:**  I let the whole situation

14   just bowl me over.  I didn't stop to think about

15   what I was about to do.  I didn't consider the

16   consequences.  I didn't consider what it would do

17   to my daughter and to my family, and I didn't

18   consider what it would do to my wife, that it

19   would take my wife's life from her.  It was just a

20   situation that I didn't have any insight into.  I

21   didn't look down the road to see what kind of

22   impact that it would have and I just acted on the

23   way that I felt (inaudible) being angry and upset

24   and depressed and I acted on that and I acted out

25   in a violent manner.

26         **PRESIDING COMMISSIONER LEE:**  I just want to

27   clarify the last statement that I read to you.

53

1   Part of your aggravation so to speak was because

2   of the fact that you felt your daughter was

3   actually -- I don't want to say defiled, but was

4   in the vicinity of the activities that your wife

5   was involved in.

6        INMATE BOONE:  Yes, Sir.

7        PRESIDING COMMISSIONER LEE:  And what made

8   you believe that?

9        INMATE BOONE:  She told me.

10       PRESIDING COMMISSIONER LEE:  Your daughter

11  (inaudible)?

12       INMATE BOONE:  She didn't understand why

13  mommy was with other guys.  She didn't understand

14  why when she went to bed there would be one guy in

15  the house and when she woke up there would be

16  another guy there.

17       PRESIDING COMMISSIONER LEE:  And you talked

18  to your daughter about this (inaudible)?

19       INMATE BOONE:  Well she was talking to me.

20  I wasn't -- I just said, well, Heather, daddy's

21  home now and that's not going to happen anymore.

22  There won't be anybody else coming in our house.

23  And Crane was whipping my daughter and --

24       PRESIDING COMMISSIONER LEE:  What was that?

25       INMATE BOONE:  He was whipping her for

26  getting her clothes dirty.  He would whip her.

27       PRESIDING COMMISSIONER LEE:  We have no

54

1    information about that.

2        INMATE BOONE:  No, that was a conversation

3    that I had with my daughter, that he was whipping

4    her for getting her clothes dirty.  And she said,

5    he would talk mean to me.

6        PRESIDING COMMISSIONER LEE:  Go ahead,

7    counsel.

8        DEPUTY DISTRICT ATTORNEY WILSON:

9    Commissioner, if you could follow up.  The reason

10   I asked the question, I'm concerned or trying to

11   clarify, did he kill -- jealousy, did he kill

12   because he was afraid of the divorce, was he

13   afraid of the custody issue?  And the reason I say

14   that, I'm looking at the August 1995 psychological

15   evaluation and in there there's some conversation

16   about the inmate being concerned, and here's a

17   quote, he said that his main concern was that his

18   wife not get their daughter.  So was his killing

19   -- jealousy, divorce issues, custody issues, if he

20   could clarify that?

21       PRESIDING COMMISSIONER LEE:  If you can

22   clarify it.  If it's some, all, it's up to you.

23       INMATE BOONE:  I think that question has been

24   asked and answered, but I'll elaborate on it.  I

25   don't think that any guy likes to see their wife,

26   girlfriend or whatever with another man.  But it

27   wasn't to the point where I was jealous.  This

55

```
 1   wasn't just a matter of jealousy.  This was a matter
 2   of somebody else coming into my house claiming that
 3   his life was destroyed.  I had nothing to do with
 4   Crane coming to my house.  That was of his own -- He
 5   volunteered that, that he didn't have to do that and
 6   he was told many times to stay away.  It was a
 7   combination of everything just piled up and it
 8   overtook my emotions and I acted out in a violent
 9   manner.
10           PRESIDING COMMISSIONER LEE:  All right.  Next
11   question.
12           DEPUTY DISTRICT ATTORNEY WILSON:  Yes,
13   Commissioner.  If the Commissioner -- inquire, what
14   was the time lapse between when the inmate decided
15   to murder his wife to when he pulled the trigger?
16           PRESIDING COMMISSIONER LEE:  Can you answer
17   that?
18           INMATE BOONE:  I'm not sure what the exact --
19   I don't know, maybe an hour, an hour and a half.
20   I'm not exactly sure on the time.
21           DEPUTY DISTRICT ATTORNEY WILSON:
22   Commissioner, in the reports there's a -- it's
23   referred to as the suicide note, but it looks more
24   like a will.  When did the inmate write the will or
25   suicide note?
26           INMATE BOONE:  I wrote it after I had spoken
27   to my wife on the telephone.
```

56

1          **DEPUTY DISTRICT ATTORNEY WILSON:**   If the

2     Commissioner could ask, and where was the victim,

3     what was her position when the inmate shot her?

4          **INMATE BOONE:**   She was laying on the couch in

5     the living room.

6          **DEPUTY DISTRICT ATTORNEY WILSON:**   If the

7     Commissioner could inquire, where was the inmate's

8     young daughter, the seven-year-old?

9          **INMATE BOONE:**   She was at Bonnie Stone's

10    residence.   And I can elaborate on that if you'd

11    like me to.

12         **PRESIDING COMMISSIONER LEE:**   No, the

13    question's answered.   Next question.

14         **DEPUTY DISTRICT ATTORNEY WILSON:**   There's

15    some indication again in the psychological report,

16    August 7, 1995, that the inmate felt the legal

17    system was not assisting him.   What, if any,

18    attempts did the inmate make to use the legal system

19    to his avail?

20         **PRESIDING COMMISSIONER LEE:**   Do you know what

21    the question is?

22         **INMATE BOONE:**   Well that's a report that's

23    10-years-old.   This is 2005 and I'm not -- I'm not

24    going to even get into anything that that's far back

25    as far as psychological reports.   I have a good

26    psychological report right now.   And basically all

27    my psychological reports mirror each other.

57

1          **PRESIDING COMMISSIONER LEE:**    (Inaudible) he's

2    made his answer.    Next question.

3          **DEPUTY DISTRICT ATTORNEY WILSON:**    (Inaudible)

4    rephrase, Commissioner.    Did he seek legal help when

5    he found out about the affair his wife was having?

6    Did he seek legal help to try to rectify it or

7    protect his interest or his wife's interests or his

8    daughter's interest?

9          **INMATE BOONE:**    Yes, I did.

10          **PRESIDING COMMISSIONER LEE:**    Anything

11    further?

12          **DEPUTY DISTRICT ATTORNEY WILSON:**    Yes.    The

13    Commissioner asked about the restraining order.    The

14    inmate indicates that he was not aware of it.    On

15    page 24 in the packet there's a copy of a

16    restraining order that appears to have been served

17    on the inmate on April 22.    Is the inmate -- does

18    that -- Does that ring a bell to the inmate?

19          **INMATE BOONE:**    I said that I wasn't aware of

20    it when I got home.    There was no mention of a

21    restraining order on the night that I got home.    But

22    I was made aware of it at a later date, but not

23    immediately.

24          **PRESIDING COMMISSIONER LEE:**    Anything else?

25          **DEPUTY DISTRICT ATTORNEY WILSON:**    Yes,

26    Commissioner.    I'm looking at the affidavit prepared

27    by the victim's -- the victim in this case,

58

1    Ms. Boone, attached -- I'm wondering if the inmate

2    could clarify this for me.  She writes that:

3              "My husband has a past history of

4              violent acts against me.  The last

5              violent incident occurred when he

6              slapped me on the face.  He shoved me

7              against the wall of our house.  My

8              husband then ripped my clothes.  He

9              unhooked a wire on my car so I could

10             not leave."

11   And this is basically what she attached seeking

12   the restraining order.  If that could be

13   clarified.

14             **PRESIDING COMMISSIONER LEE:**  Just answer yes

15   or no.  Did that happen or not?

16             **INMATE BOONE:**  No, Sir.

17             **PRESIDING COMMISSIONER LEE:**  All right.

18   Next question.

19             **DEPUTY DISTRICT ATTORNEY WILSON:**  Last

20   question, Commissioner.  This is the last page of

21   the police -- sheriff -- police report that's

22   attached to the packet.  It's by officer --

23   Detective Mullins.  It's an interview with the

24   inmate's daughter.  And in there the daughter

25   indicates that she heard her father make threats

26   towards her mother.  What was the nature of those

27   threats?

59

1          PRESIDING COMMISSIONER LEE:  Do you

2    remember?

3          INMATE BOONE:  There weren't any -- There

4    weren't any threats towards my wife.  I told her I

5    didn't want -- I told her that Crane wasn't going

6    to come into my house anymore.

7          PRESIDING COMMISSIONER LEE:  All right.

8    Anything further?

9          DEPUTY DISTRICT ATTORNEY WILSON:

10   (Indiscernible) following up on that.  It reads --

11   last paragraph there:

12          "The child -- meaning daughter -- had

13          gone into the bedroom after her

14          father returned from overseas to hide

15          the shotgun, but her father had come

16          in before so she could not do it.  I

17          asked her again if she had gone into

18          the room to hide it, and she said,

19          yes.  Apparently she was afraid that

20          the father was going to hurt her

21          mother with the shotgun and didn't

22          want her father to kill her mother."

23   Any idea why your daughter had that thought

24   process?

25          INMATE BOONE:  No.  I wasn't there.

26          PRESIDING COMMISSIONER LEE:  Anything

27   further?

60

1          **DEPUTY DISTRICT ATTORNEY WILSON:**  Nothing

2     further.

3          **PRESIDING COMMISSIONER LEE:**  All right.  You

4     don't have any questions to ask yourself, so we're

5     going to statements.  Counsel, you may be heard.

6          **DEPUTY DISTRICT ATTORNEY WILSON:**   Just

7     briefly, Commissioners.  This has been

8     characterized -- and as the Commissioner stated

9     this -- as a crime of passion.  I would be the

10    first to agree that no man should experience what

11    this inmate did, having to walk in to see your

12    wife with another man.  That's just something that

13    -- that's just cruel.  But this inmate's actions

14    are not justified even by that.  And I take with

15    due respect the characterization of this as a

16    crime of passion, I think that's wrong.  Just

17    looking at the Board report, just the sequence of

18    events.  There's three weeks between when the

19    inmate got home and found his wife in the arms of

20    another man to when he murdered his wife in cold

21    blood.  As she's laying on the couch, he fires the

22    shotgun twice, dead center in her chest, death.

23    There's no question what he wanted to do.  I

24    understand the rage, but I think this Commission

25    has to look at the timeframe here.  Commissioner

26    Lee was questioning the inmate about any knowledge

27    -- any prior affairs and in that Board report when

61

1   he was overseas the first time he says he

2   suspected there might have been extramarital

3   relationships.  I use it as plural because people

4   don't throw that out just on a whim.  If you say

5   that, you really believe it.  He'd already been

6   kind of jaded to the fact that his wife was

7   fooling around on him, that she was having

8   affairs, not right, should he have been subjected

9   to that, no.  But this isn't something that just

10   shocked him right out of his pants.  Okay, maybe

11   that first night when he did have a fight with the

12   Marine that was fooling around with this wife,

13   that's heat of passion.  When you have that first

14   fight, that's heat of passion (indiscernible)

15   justified, but I think any man's going to say I

16   understand that.  But as time goes on, as the

17   conversations go on, as he's with his Marine

18   family -- Don't forget, he's at 29 Palms.  It's a

19   Marine base.  Marines pride themselves on family,

20   of taking care of one another.  When he's with

21   people he can talk to, time's elapsing.  He's

22   having these conversations with his wife.  His

23   marriage is disintegrating.  I mean, his wife is

24   saying, I don't want to be with you.  I want to be

25   with another man.  Very hard to hear, but that

26   happens unfortunately all the time.  I mean,

27   divorce statistics are up there 50 percent I

62

1    think, a vast majority of those are the result of
2    people who have situations similar to this inmate
3    but they handled it differently.   They didn't take
4    a shotgun and they didn't go out and execute their
5    wife.   I think what this Board needs to really
6    look at in terms of, you know, was this heat of
7    passion is that affidavit that the victim wrote
8    prior to her death.   Basically she's being abused,
9    she's being abused by this man.   It's in the
10   affidavit.   If the Board wants to know more, look
11   at the words of that seven-year-old.   She went
12   into the closet in an attempt to hide the shotgun
13   because she was afraid of what her dad was going
14   to do.   The only way a seven-year-old knows that
15   is if it's telegraphed.   She's got to know.   I
16   mean, she's not sitting -- watching TV and all of
17   a sudden going, hey, I got to get the shotgun out
18   of the closet.   She knows because there's a
19   pattern of violence or something's keyed her off
20   that her dad is going to hurt her mom.   That's not
21   sudden heat of passion, that's cruel, that's
22   premeditated, that's -- execution.   This man was
23   going to lose his daughter, it's in the psych
24   report in 1995 where he goes through -- I'm afraid
25   to lose my daughter, my wife cannot have her.
26   That's why he killed his wife.   Not because --
27   some sudden heat passion.   This man has no insight

63

1    into the crime.  The best way to describe it, the

2    way you can justify it is that sudden heat of

3    passion.  I urge the Board not to buy off on that,

4    not to buy off that this is some rash decision

5    that he made.  This was calculated.  He had an

6    opportunity to walk out, walk away.  He didn't

7    have to stay in that house.  He could have gone

8    back overseas, could have asked for a different

9    deployment.  But he chose to basically rectify the

10   situation in the best way he thought which was the

11   wrong way which was by murdering his wife.  And

12   based upon that, in addition with the new 115 that

13   he's picked up in recent time, I urge the Board to

14   not set a date and deny parole at this time.

15          **PRESIDING COMMISSIONER LEE:**  Thank you, sir.

16   You may make your comment at this time, sir.

17          **INMATE BOONE:**  May I comment on what the

18   District Attorney just said?

19          **PRESIDING COMMISSIONER LEE:**  Only briefly,

20   that's always the difficulty of representing

21   yourself.

22          **INMATE BOONE:**  Okay.

23          **PRESIDING COMMISSIONER LEE:**  As well as

24   making -- as opposed to having an attorney.  But I

25   will because I know what you're going to say.  Go

26   ahead (inaudible) record.

27          **INMATE BOONE:**  Yes, I was shocked when I

64

1    walked into my house after not being there for a

2    year to catch my wife with a guy laying on top of

3    her.  As far as my wife's statement, I'm not opposed

4    to my husband seeing our daughter, but she had it in

5    the restraining order.  I hadn't seen my daughter in

6    a year.  I hadn't done anything to deserve not being

7    able to see my daughter or my wife as far as that

8    goes.  However, when my daughter took -- when my

9    husband took our daughter away last time -- never

10   happened.  I don't even know what she was talking

11   about.  I asked him how long he would be away.  I

12   had no reason to take her away any place.  This is

13   all in her statement to get a restraining order

14   because she wants to try to make me look as bad as

15   she possibly can in order to obtain a restraining

16   order, and I'm just shocked that you can go in there

17   -- spouse can go into an attorney's office with her

18   boyfriend, make allegations against her husband that

19   are completely false and get a restraining order.

20           **PRESIDING COMMISSIONER LEE:**  It's true.  Go

21   ahead.

22           **INMATE BOONE:**  That's all I had to say, Sir.

23           **PRESIDING COMMISSIONER LEE:**  You don't want

24   to add anything in regards to your comment?  You

25   just wanted to respond to him?

26           **INMATE BOONE:**  As far as what?

27           **PRESIDING COMMISSIONER LEE:**  You were

65

1    responding to the Deputy District Attorney's

2    statement.  Do you want to add anything else?  If

3    not, then we will recess.

4         INMATE BOONE:  Other than I heard him say

5    execution, I do not have an execution style

6    murder.  I have paperwork that says second degree

7    murder as agreed to by the District Attorney.  The

8    District Attorney on this case was well aware of

9    the circumstances in my case and is more familiar

10   with the case than the present District Attorney

11   or Assistant District Attorney is.

12        PRESIDING COMMISSIONER LEE:  That is true.

13   However, the District Attorney has the right to --

14        INMATE BOONE:  Yes, Sir.

15        PRESIDING COMMISSIONER LEE:  -- (inaudible)

16   all the facts.

17        INMATE BOONE:  Yes, Sir.

18        PRESIDING COMMISSIONER LEE:  I'm not going

19   to treat this as a first degree murder case, but I

20   can take into -- all the factors.

21        INMATE BOONE:  Yes, Sir.  Okay.

22        PRESIDING COMMISSIONER LEE:  So is there

23   anything else?

24        INMATE BOONE:  No, Sir.  That's all I have.

25   Thank you.

26        PRESIDING COMMISSIONER LEE:  All right.  At

27   this time we're going to recess.  It is 6:04.

66

1          **INMATE BOONE:**  I have pictures if you'd like

2     -- of my daughter, of the residence where I'll be

3     -- I could live.

4          **PRESIDING COMMISSIONER LEE:**  Let's say this,

5     I don't know how you're going to react after we

6     come back with our decision, but if you still want

7     offer me to see them at that time, I'll take a

8     look at them.  All right.

9          **INMATE BOONE:**  Okay.

10                        **R E C E S S**

11                        --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

67

1    CALIFORNIA BOARD OF PRISON TERMS

2    D E C I S I O N

3        PRESIDING COMMISSIONER LEE:   All right.

4    We're back on the record in regards to this

5    matter.   And I am going to indicate the Panel has

6    reviewed all the information received from the

7    public and relied on the following circumstances

8    in concluding the prisoner is not suitable for

9    parole and would pose an unreasonable risk of

10   danger to society or a threat to public safety if

11   released from prison.   The motive for the crime is

12   explicable or very trivial in relationship to the

13   offense.   Now sir, you're probably wondering why I

14   didn't add all the other reasons why, such as

15   callous disregard and everything else like that.

16   And I got to be honest with you, there's no such

17   thing as an average murder.   But in this

18   particular case I cannot say that you

19   intentionally wanted to make your wife suffer.   I

20   don't believe it was an execution style murder.   I

21   believe based upon all the information that your

22   story seems more consistent that you were

23   attempting to work this out, that you didn't go

24   off the handle when you saw her -- him originally,

25   which probably most people would have.   But that

26   it really did hit you finally when she indicated

27   **DONALD BOONE    D-37952    DECISION PAGE 1    4/27/05**

68

1 that she no longer wanted to be in the marriage

2 and she wanted to have sexual ventures with

3 whomever she wanted, that you realized that it was

4 over. So at that point in time I believe that you

5 did act irrationally. That's not an excuse, but

6 I'm not in the area of finding guilt. You've

7 already been convicted for second degree murder so

8 that will not change. However, I will indicate at

9 this point in time there is another reason for

10 denial, and unfortunately you have to accept it, I

11 think you have, is that that 115 will cost you.

12 The institutional behavior is the other reason

13 you're being denied. You failed to demonstrate

14 evidence of positive change, misconduct while

15 incarceration includes a 115. That 115 is going

16 to cost you, but it will not cost you forever. In

17 fact, the Commissioner and I looked up your score.

18 Your score still remains the same. In fact,

19 because of all the years you did not have 115's,

20 you actually -- they gave you that one, your score

21 did not change. Okay. So I guess in a sense that

22 was a good gamble in that sense if you had to do

23 it. The other reason that you're being denied is

24 something that can be readily fixed. You do not

25 have a viable residence in the last county of

26 legal residence. Even though Ms. Kahar has

27 **DONALD BOONE     D-37952     DECISION PAGE 2     4/27/05**

69

1    offered for you to live there, she's in Felton

2    which we do not believe is in San Bernardino

3    County.  Counsel, do you know --

4         **DEPUTY COMMISSIONER CATER:**  Santa Cruz.

5         **DEPUTY DISTRICT ATTORNEY WILSON:**  It's not

6    San Bernardino.

7         **PRESIDING COMMISSIONER LEE:**  It's not San

8    Bernardino.

9         **INMATE BOONE:**  No, it's not.

10        **PRESIDING COMMISSIONER LEE:**  Yeah, it's Santa

11   Cruz.  Now the other reason that we're denying you

12   is because of 3042 responses.  The District Attorney

13   of San Bernardino County obviously is opposed, and I

14   will indicate there was also an opposition by the

15   law enforcement agency of that area.  I believe it's

16   the sheriff's department.  Hold on just a second.

17   It is the sheriff's department and they have written

18   a letter.  However, it is not signed by Gary Penrod,

19   the Sheriff, so therefore I did not need to read it

20   into the record, and it's dated October 19 the year

21   2004, and basically says:  "Boone committed this

22   heinous act and therefore the department believes he

23   should be required to serve the maximum sentence

24   possible."  I have no idea what that means.

25   Basically, the bottom line is the maximum sentence

26   possible is what the Board of Prison Terms

27   **DONALD BOONE    D-37952    DECISION PAGE 3    4/27/05**

70

1    determines it to be.  Most of the letters we get is

2    deny his date.  So at this point in time it doesn't

3    make any difference because the District Attorney's

4    Office of San Bernardino County did send a

5    representative and has made his position known.  The

6    Panel makes the following findings.  At this point

7    in time, sir, I don't believe that there is anything

8    that you need to do other than your gains are recent

9    and you must maintain the gains over an extended

10   period of time.  Commissioner Welch mentioned that

11   to you.  The further you put these 115 behind --

12   this 115 behind you, the sooner you're probably

13   going to get a date.  But at this point in time it's

14   still pretty fresh.  All right.  And don't get me

15   wrong, we took into account -- we took fully into

16   account the fact that your story was plausible

17   simply because if it was something else like

18   drinking or you had a knife or something like that,

19   that we could probably wonder why you were doing it.

20   But all these years of obeying the rules and your

21   military -- and then all of a sudden -- I think

22   Commissioner Welch brought this up -- then all of a

23   sudden you don't obey a rule, which is not really a

24   big rule at that, seems to indicate that there was

25   something behind that.  So in that sense we denied

26   you, but obviously for all those reasons we're going

27   **DONALD BOONE**    **D-37952**    **DECISION PAGE 4**    **4/27/05**

71

1    to deny you merely for a year.  You'll come up again

2    in a year, sir.  And we wish you the best of luck.

3    We hope that at some point in time that as time goes

4    on you continue to keep in contact with all the

5    people that you're in contact -- now and someday

6    maybe you will be reunited with your daughter.  But

7    at this point in time, Commissioner, is there

8    anything you would like to add?

9         **DEPUTY COMMISSIONER CATER:**  Nothing further,

10   thank you.

11        **PRESIDING COMMISSIONER LEE:**  All right.  Good

12   luck, sir.

13        **INMATE BOONE:**  Thank you.

14                      --oOo--

15

16

17

18

19

20

21

22

23   PAROLE DENIED ONE YEAR

24   THIS DECISION WILL BE FINAL ON Aug. 25, 2005

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   DONALD BOONE    D-37952    DECISION PAGE 5    4/27/05

72

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Marsha Mees, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 71, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of DONALD BOONE, CDC No. D-37952 on APRIL 27, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated May 13, 2005 at Sacramento County, California.

_Marsha Mees_

Marsha Mees
Transcriber
**CAPITOL ELECTRONIC REPORTING**