# EXHIBIT 5
# Part 3 of 3

70

1   research out, they will pull that information

2   out, get the information back to you.  You will

3   not have access to the Internet.

4        INMATE BOONE:  No, no.

5        PRESIDING COMMISSIONER BIGGERS:  But they

6   do.

7        INMATE BOONE:  Well I don't know if

8   they --

9        DEPUTY COMMISSIONER MORRIS:

10  (Overlapping) hundreds of thousands of dollars

11  on every institution to make sure that's

12  available.  And that was in the top of the '90s

13  when that happened.

14       PRESIDING COMMISSIONER BIGGERS:  So

15  again, all I'm telling you is that you need to

16  -- you've been working on this and you keep

17  running into roadblocks.  But I think that's

18  because you probably did not know that that

19  service was available to you.

20       INMATE BOONE:  The other problem is they

21  list all the -- in the veterans book they list

22  phone numbers and we can't, I can't call.

23       PRESIDING COMMISSIONER BIGGERS:  I

24  understand that.

25       INMATE BOONE:  I can't call on the

26  telephone.

27       DEPUTY COMMISSIONER MORRIS:  You're going

1   to have to write.

2       PRESIDING COMMISSIONER BIGGERS:   You have

3   to write them.

4       INMATE BOONE:   There's no address.   You

5   say there's an Internet thing in the library,

6   maybe I can try that.   But there's, you know,

7   there isn't anything --

8       PRESIDING COMMISSIONER BIGGERS:   Did you

9   note, follow what he said about the procedures

10   to use that?

11       INMATE BOONE:   Yes sir.

12       DEPUTY COMMISSIONER MORRIS:   The way you

13   write these appeals, submit that request for

14   interview.   And be as persistent --

15       INMATE BOONE:   I was pretty persistent on

16   here and I get no place.

17       DEPUTY COMMISSIONER MORRIS:   Somebody out

18   there, I think it was Thoreau that said

19   something about if you knock long enough, loud

20   enough, hard enough, somebody will answer.   And

21   it may not be, it may not be easy but there --

22       PRESIDING COMMISSIONER BIGGERS:

23   Something to think about if you don't get a date

24   today.

25       INMATE BOONE:   Yes sir.

26       PRESIDING COMMISSIONER BIGGERS:   Okay,

27   all right.   I am going to go to your letters and

72

1    I got some letters in the updated material here.

2    These are your letters of support.  And the

3    first one I have is from, this is Brian.

4         INMATE BOONE:  Yes sir, that's my

5    brother.

6         PRESIDING COMMISSIONER BIGGERS:  Brian

7    Boone, that's your brother.

8         INMATE BOONE:  Yes sir.

9         PRESIDING COMMISSIONER BIGGERS:  He

10   indicates that he has a parole hearing coming up

11   in a month and once you are found suitable for

12   parole you can come live with him.  He lives in

13   New Jersey.

14        INMATE BOONE:  Yes sir.

15        PRESIDING COMMISSIONER BIGGERS:  Okay.

16   And he talks about how the family really wanted

17   to have you back.  Then I have one from Doris

18   Walker.

19        INMATE BOONE:  Yes sir.

20        PRESIDING COMMISSIONER BIGGERS:  W-A-L-K-

21   E-R, and that's dated January 10, 2006.  Again

22   she is writing a letter in behalf of you.  And

23   she says, unfortunately she had to leave the

24   state of California for Texas and will probably

25   never have the pleasure of a visit with you

26   again.  When the home state is in New Jersey

27   that means that this man has been away from his

73

1    family long enough. I pray that I will soon

2    learn that he has been given a release date.

3    How did you meet Ms. Walker?

4        **INMATE BOONE:** Through a friend that I

5    have known here. I've known him for 20 years

6    now. It's his mother. And her and Mrs. Gerhard

7    used to come see us.

8        **PRESIDING COMMISSIONER BIGGERS:** Okay.

9    And this is from your brother James Boone.

10        **INMATE BOONE:** Yes sir.

11        **PRESIDING COMMISSIONER BIGGERS:** He's a

12    retired Navy Chief Petty Officer from the Navy.

13    He is now an IT support technician for a major

14    insurance company for the last six years. He

15    says you have always shown remorse and have

16    always taken full responsibility for the action.

17    And this one doesn't have a date on it. Karen

18    wrote down here, Corrine rather, said 8/10/06.

19    So I'm assuming that's probably when it got to

20    the institution.

21        **INMATE BOONE:** Yes sir.

22        **PRESIDING COMMISSIONER BIGGERS:** Has an

23    extensive work history and a long record of

24    service to his country. Disciplinary history

25    during his incarceration shows that he obeys the

26    rules in prison. Says you have a positive

27    attitude, you have maintained correspondence

1   with him and his wife and the two children.

2   Says you love music, a love of music with his

3   daughter, who will start a music major this

4   fall.

5           **INMATE BOONE:**  Yes sir.

6           **PRESIDING COMMISSIONER BIGGERS:**  You're a

7   caring individual.  This letter is from

8   Ms. Gerhard, who is the one that we talked about

9   in Felton, California.

10          **INMATE BOONE:**  Yes sir.

11          **PRESIDING COMMISSIONER BIGGERS:**

12  2/28/2006.  She indicates she feels privileged

13  to write on behalf of you.  She strongly

14  encourages us to consider you for parole at this

15  time.  Says you have been a special friend of

16  hers after meeting them in prison.  I visit him

17  quite frequently since then.  I know I find him

18  definitely a very genuine and sincere young man.

19  And she said that let it be known that you can

20  reside with her in her house if need be.  She is

21  75-plus years young and really needs to hire a

22  gardener to help her take care of her one-third

23  acre right in the middle of the quaint little

24  town of Felton.

25          **INMATE BOONE:**  Yes sir.

26          **PRESIDING COMMISSIONER BIGGERS:**  Be most

27  excited to hire him as a gardener and

1   maintenance man as I really need some help.   I

2   do have an extra room.   If this position would

3   fit into his plan I would offer him room and

4   board along with a salary.   It would have helped

5   if she told you how much she was going to pay

6   you too.

7          **INMATE BOONE:**   Okay.

8          **PRESIDING COMMISSIONER BIGGERS:**   Agree?

9          **INMATE BOONE:**   Yes sir.

10         **PRESIDING COMMISSIONER BIGGERS:**   Says

11  you're very trustworthy and you being here would

12  certainly give her peace of mind.   She says she

13  trusts that this letter will prove to be a very

14  strong support for your welfare and future.   And

15  also she said that you have a lovely family in

16  New Jersey and they want you to be home.

17         **INMATE BOONE:**   Yes sir.

18         **PRESIDING COMMISSIONER BIGGERS:**   Okay.

19  Is that the last support letter?   Are those the

20  only support letters you have?

21         **INMATE BOONE:**   I had several other ones

22  that I got that --

23         **PRESIDING COMMISSIONER BIGGERS:**   I'm

24  sorry, there's another one here from 2005 that

25  was after your last hearing that I want to get

26  on the record too.

27         **INMATE BOONE:**   Okay.

76

1   **PRESIDING COMMISSIONER BIGGERS:** This is

2 from a Walter A. Asselin, A-S-S-E-L-I-N, in

3 North Carolina. And this was -- he is a former,

4 a retired Master Sergeant.

5   **INMATE BOONE:** Yes sir.

6   **PRESIDING COMMISSIONER BIGGERS:** He says,

7 I have known Don -- And again, I am putting this

8 in on '05 for the record primarily because this

9 came in after your last hearing.

10   **INMATE BOONE:** Okay.

11   **PRESIDING COMMISSIONER BIGGERS:** The last

12 hearing was in April and this came in in May.

13   **INMATE BOONE:** Yes sir.

14   **PRESIDING COMMISSIONER BIGGERS:** Okay. I

15 have known Don since October 1980 when I became

16 a new drill instructor assigned to the crew

17 training battalion on Parris Island, South

18 Carolina. Apparently you trained him as a DI.

19 Were you a drill instructor?

20   **INMATE BOONE:** Yes sir.

21   **PRESIDING COMMISSIONER BIGGERS:** He knew

22 you and your wife Velvet and your daughter

23 Heather. She was about three or four years old

24 at the time. I know that the past 19 years have

25 probably been unbearable to some extent but I

26 truly believe that the Marine Corps training and

27 the discipline that he ingrained in every Marine

77

1   has helped him over the last 19 years.   I'm
2   pretty sure that if Don put forth the effort
3   towards his time in prison the same way he did
4   as a Marine then it would be a very model and
5   professional existence.   I am under the
6   impression that Don has met all the requirements
7   required of him and that at some point he would
8   be considered eligible for parole.   I truly
9   believe that if Velvet had a say in this she
10  would want Don to be part of her daughter's life
11  and that of his grandchild because she knew how
12  much he loved Heather.   Nothing he can do to
13  change the past.   I do not believe Don is a
14  threat to anyone and feel free to contact me.   I
15  hope to see my old friend someday.   I'm looking
16  forward to his face and telling him Semper Fi.
17  A very good letter from a retired Master
18  Sergeant Marine.   Do you have any others sir?
19  You said you had a couple of others.
20          **INMATE BOONE:**   I don't know if you got
21  the one from Lancaster?
22          **PRESIDING COMMISSIONER BIGGERS:**   No I did
23  not.
24          **INMATE BOONE:**   That was the only, that
25  was the only one.
26          **PRESIDING COMMISSIONER BIGGERS:**   This one
27  is dated July 20, 2006 and it is from

78

1  Mr. Herbert B. Lancaster, L-A-N-C-A-S-T-E-R.
2  During the past 11 years my wife and I have
3  written eight letters of support for our cousin,
4  Donald Boone. We are going on the presumption
5  that these are still on file and a matter of
6  record in this case. I will not restate all the
7  remarks that have been previously made. He made
8  a terrible mistake when he committed this
9  heinous crime that caused his incarceration. He
10  deserved punishment and he got it. Then he
11  talks about taking a life. What makes Don
12  different than many of the inmates is the
13  support system that he has. His two brothers
14  and a sister continue to be in contact with him.
15  Many friends send their support back in his
16  native state of New Jersey. We join his uncles
17  and aunts as part of that group who won't forget
18  but are ready to forgive and accept him back.
19  Don is not a threat to society and would not
20  revert back to a life of crime as is the case
21  for many convicts. Personally I am baffled as
22  to why after being found suitable for parole he
23  continues to be rejected by a previous decision
24  by the Board of Prison Terms. At the next
25  hearing it is my hope that the new Board of
26  Prison Terms will recommend to the Governor that
27  Donald Boone is truly suitable for parole. And

79

1   that is Mr. Herbert B. Lancaster.  I got it on

2   the record, I'm going to give it back to you.

3   In the event you don't get a date today, you

4   know, you can make sure that they get it into

5   your record.

6           **INMATE BOONE:**  All right.

7           **PRESIDING COMMISSIONER BIGGERS:**  Okay.

8   We sent out 3042 notices and I did get a letter

9   of opposition from, and it's in your packet as

10  well, from Mr. Gary Penrod who indicated:

11              "Thank you for the opportunity to

12              have input into the life prisoner

13              subsequent parole consideration

14              for Donald Boone scheduled for

15              August 10, 2006."

16          **INMATE BOONE:**  Is this the one here?

17          **PRESIDING COMMISSIONER BIGGERS:**  Yes.

18          **INMATE BOONE:**  I didn't see it yet.

19          **PRESIDING COMMISSIONER BIGGERS:**  It's in

20  there.  You haven't seen that before?

21          **INMATE BOONE:**  No sir.

22          **PRESIDING COMMISSIONER BIGGERS:**  Okay.

23  Well we have the District Attorney here from San

24  Bernardino County, although -- this is the first

25  time that you have seen this?

26          **INMATE BOONE:**  Yes sir.

27          **PRESIDING COMMISSIONER BIGGERS:**  Okay.

80

1  Well, in all fairness to you sir, and I don't
2  know if you are aware of this, there is a ten
3  day rule that you should have been able to see
4  all of this so therefore I will not enter it
5  into the record.
6      INMATE BOONE:  Okay.
7      PRESIDING COMMISSIONER BIGGERS:  However
8  you should -- I don't know why they didn't send
9  that to you.  However, we do have a
10  representative from the District Attorney's
11  Office in San Bernardino who can speak on behalf
12  of the citizens of San Bernardino.
13      INMATE BOONE:  Okay.
14      PRESIDING COMMISSIONER BIGGERS:  Okay, at
15  this point then did I miss any letters or
16  anything that you have?
17      INMATE BOONE:  No sir, that's it.
18      PRESIDING COMMISSIONER BIGGERS:  Okay,
19  anything else on your parole plans that you want
20  to tell me about?
21      INMATE BOONE:  I contacted the, I told
22  you about the Department of Affairs, Veterans
23  Affairs.
24      PRESIDING COMMISSIONER BIGGERS:  Right.
25      INMATE BOONE:  And planning for release.
26  And I also contacted the California Department
27  of Corrections and Rehabilitation if you'd like

81

1    to see this letter.   This was another one that I

2    asked about having my parole transferred to New

3    Jersey because I am having a problem with

4    housing out here.

5              **PRESIDING COMMISSIONER BIGGERS:**   This

6    letter is dated July 13, 2006.   It is from the

7    Division of Adult Parole Operations.

8              "I am responding to your letter to

9              the Department of Corrections

10             Adult Parole Office.   In your

11             letter you requested to have your

12             parole transferred to New Jersey.

13             In order to have your parole

14             transferred you need to contact

15             your current correctional

16             counselor I to complete an

17             interstate transfer request.

18             However, transfer requests can be

19             completed at any time during the

20             parole period provided it is

21             determined that the request is in

22             compliance with policies and

23             procedures.   Approval of transfer

24             is made with the best interests of

25             the parolee and the community in

26             mind.   At this time you have not

27             been assigned to a parole unit.

82

1          Once you are assigned to a parole

2          unit they will provide you with

3          any assistance you may need to

4          assist you while you are on

5          parole."

6      **INMATE BOONE:**  Yes sir.

7          **PRESIDING COMMISSIONER BIGGERS:**  Okay.

8  Did you -- But I thought you said earlier that

9  there is not a state pact between New Jersey

10  and --

11      **INMATE BOONE:**  No there is not, there is

12  not a state pact between New Jersey and

13  California.

14          **PRESIDING COMMISSIONER BIGGERS:**  And

15  California.

16      **INMATE BOONE:**  Yes sir.

17          **PRESIDING COMMISSIONER BIGGERS:**  Okay.

18  So I can -- okay.

19      **DEPUTY COMMISSIONER MORRIS:**  Let me see

20  that.  Who signed that?  Who signed that?

21          **PRESIDING COMMISSIONER BIGGERS:**  How long

22  have you been incarcerated sir?

23      **INMATE BOONE:**  A little bit over 20

24  years.

25      **DEPUTY COMMISSIONER MORRIS:**  This is out

26  of Region IV.

27          **PRESIDING COMMISSIONER BIGGERS:**  Region

83

1  IV?

2        **DEPUTY COMMISSIONER MORRIS:** Diamond Bar.

3        **PRESIDING COMMISSIONER BIGGERS:** Okay, at

4  this point I am going to -- we'll give that back

5  to him.  I am going to ask the district attorney

6  if she has any questions for Mr. Boone.

7        **DEPUTY DISTRICT ATTORNEY DAWSON:** Yes

8  sir.  In following up I believe you had asked

9  questions about the inmate suspecting that his

10  wife had extramarital affairs prior to the date

11  when he came back in 1986.  And I believe he

12  stated that he did not.  And I am looking at a

13  Parole Board Report dated March of 2001, page

14  three, where it says, after he returned from

15  Okinawa that he suspected that there may have

16  been extramarital relationships.  And I was

17  wondering if he could explain to us how he then

18  claims in '86 he had no idea that this had ever

19  happened.

20        **INMATE BOONE:** Not this incident.  I was

21  never aware of this incident right here.

22        **PRESIDING COMMISSIONER BIGGERS:** Which

23  incident?

24        **INMATE BOONE:** When I came home I wasn't

25  aware of anything that was going on.

26        **PRESIDING COMMISSIONER BIGGERS:** That

27  happened with Mr. Crane.

84

1          INMATE BOONE:  Yes sir.

2          PRESIDING COMMISSIONER BIGGERS:  But when

3  we were talking about prior to, I think that was

4  one of my first questions I had.

5          INMATE BOONE:  Yes sir.

6          PRESIDING COMMISSIONER BIGGERS:  Was, did

7  you have any idea that your wife was having

8  extramarital affairs prior to this incident?

9          INMATE BOONE:  Maybe, but I wasn't sure

10  so I didn't press the issue.  I'm not going to

11  accuse her of something that she might not have

12  been doing.

13          PRESIDING COMMISSIONER BIGGERS:  Okay.

14          DEPUTY DISTRICT ATTORNEY DAWSON:  On

15  April 24, 1986 did the sheriff's department come

16  out to the house and remove him from the house

17  for a violation of the restraining order?

18          INMATE BOONE:  Not at my house, at Firma

19  (phonetic) Flores.  She was at the residence of

20  Firma Flores.

21          PRESIDING COMMISSIONER BIGGERS:  Flores.

22          INMATE BOONE:  Yes ma'am.  Excuse me sir,

23  yes sir.  But I was removed from there.  I went

24  to check on my daughter as my command had

25  recommended that I do because of the situation.

26          DEPUTY DISTRICT ATTORNEY DAWSON:  In the

27  letter or the will that you left when you asked

85

1   that your child go to your parents and that your

2   belongings be sold you also stated that you

3   could not allow your wife to continue to hurt

4   people and destroy your daughter's moral values.

5   How was your wife hurting people and destroying

6   your daughter's moral values?

7        INMATE BOONE:  She hurt me, she hurt my

8   daughter.  She was bringing individuals into the

9   house.  My daughter was a pretty confused little

10  girl when I got home.  Asking me questions about

11  why were there so many guys in and out of the

12  house, who were they, what were they doing

13  there, why are they sleeping with mommy.

14       PRESIDING COMMISSIONER BIGGERS:  How old

15  was your daughter?

16       INMATE BOONE:  She was seven years old at

17  the time.  My wife was leaving her alone at

18  times so she could go to the club.  Feeding her

19  a pack of frozen hot dogs so that Heather could

20  have something to eat.  There was one incident

21  where Heather wasn't used to having anyone watch

22  her so she took off on her bike.  And the last

23  time I had seen her, I had put up a swing set.

24  The last time I seen her that's where she was,

25  out back playing on the swing.  I went out back

26  probably maybe ten minutes later and Heather was

27  gone.  I asked my wife, have you seen Heather

86

1  and she said, no. So I started looking around

2  the neighborhood. I go over to Staff Sargent

3  Taber's house because his daughter and my

4  daughter were friends and he said he hadn't seen

5  her. Starting to get worried. I go to the

6  Lucky Park, which is just a walk away, she

7  wasn't here. Because I knew that there were

8  swing sets there. And what had happened was, if

9  we were over here Heather was over here. And

10  then I had to go around this way and then

11  Heather would go around that way and I missed

12  her. Well an hour goes by, I still hadn't found

13  her. And now I'm thinking that somebody that my

14  wife is involved with has gotten Heather and

15  taken off with her. I'm about ready to call the

16  police to say that my daughter is missing. I

17  said, I'm going to go back over to the Lucky

18  Park one more time just to make sure and see if

19  I can find her, and thank God that's where I

20  found her. She was swinging on the swing sets.

21        **DEPUTY DISTRICT ATTORNEY DAWSON:** Where

22  was the daughter when the shooting took place?

23        **INMATE BOONE:** She was at Bonnie Stone's

24  house, at the residence of Bonnie Stone.

25        **DEPUTY DISTRICT ATTORNEY DAWSON:** Nothing

26  further.

27        **PRESIDING COMMISSIONER BIGGERS:** Okay.

87

1   At this point do you want to add anything?

2   Because at this point I would have asked your

3   attorney to ask any questions from you.   So do

4   you have anything you want to get into the

5   record at this point?  You will get a chance to

6   make a closing statement.

7         INMATE BOONE:   Yes sir.

8         PRESIDING COMMISSIONER BIGGERS:   But I

9   want to make sure that everything that we have

10  talked about, if you want to, you know, rebut

11  anything of that before you make your closing

12  statement, now is the a good time to do that.

13        INMATE BOONE:   Again it's that, it's the

14  115.  I believe I've paid for that 115.  I had

15  my red card taken away for 90 days.  I couldn't

16  go on the yard, I had that taken for 90 days.

17  The 30 day loss wasn't much but nonetheless it

18  was either move in the dorm, and I know I'm

19  getting in a fight.  I know it, there's no doubt

20  in my mind I'm getting in a fight because of

21  what was said to me in the chow hall.  So I was,

22  I was in-between, I felt that I was in-between a

23  rock and a hard spot.  I don't know what to do.

24  Do I move into the dorm and I get into a fight

25  and then I come in here to a parole hearing and

26  they say, I'm going to be told you were in a

27  violent confrontation.

88

1          **PRESIDING COMMISSIONER BIGGERS:**  See

2    again, if somebody attacks you, you have got to

3    defend yourself.

4          **INMATE BOONE:**  Yes sir, I realize that.

5    But I don't want to take a chance on having a

6    violent confrontation or even getting hurt.  I

7    don't want to get hurt.  I don't know what

8    they're going to come at me with.  They could

9    have killed me for all I know.  And I just don't

10   want to take that chance to get into a violent

11   confrontation so I figured, if I don't move into

12   the dorm I know I'm going to get a 115 but at

13   least I'm going to be safe and I'm not going to

14   be, I will not have been involved in a violent

15   confrontation.

16          **PRESIDING COMMISSIONER BIGGERS:**  You're

17   in the dorms now?

18          **INMATE BOONE:**  Yes sir.  I moved, I moved

19   into that dorm probably two weeks after all this

20   happened when they moved some of the people out

21   that were in there.  And they were the only ones

22   coming into the chow hall because the

23   institution was locked down.  So they were the

24   only individuals actually coming into the chow

25   hall.  Everybody else was being fed through the

26   carts.  You know, they put food on a cart.  So

27   they were the only ones coming in there.  And

89

1  because they're not out on the yard they

2  figured, well we'll just come in here and we'll

3  have somebody run our stuff for us and get us

4  food. Which I'm just not going to do it.

5  **PRESIDING COMMISSIONER BIGGERS:** Okay,

6  all right. At this point then I'm going to ask

7  the district attorney to close.

8  **DEPUTY DISTRICT ATTORNEY DAWSON:** Thank

9  you. I think the inmate is being less than

10 honest today. He backpedaled when you

11 questioned him about knowledge that or

12 suspicions that his wife had not been faithful

13 to him throughout the marriage. He said no, I

14 had no idea. When pointed out on the March 2001

15 report, well no I didn't, I didn't know anything

16 about this. Then he feels that his daughter's

17 morals were being harmed by his wife having

18 extramarital sex or affairs with other men but

19 somehow values would be less harmed knowing that

20 her father took a shotgun and shot his (sic)

21 mother twice while she lay helplessly on the

22 couch. And that he couldn't live with this

23 anymore so he had to put an end to it. This is

24 a person who was very angry, had knowledge of

25 weapons and everything else and chose to kill

26 the woman that he supposedly loved to keep her

27 from being with other men and to not have to

1  fight maybe for the daughter that he claims he

2  loved so much that he had to protect her morals

3  from his wife.  I think that he is still too

4  much of a danger and he should not be given a

5  parole date.

6      **PRESIDING COMMISSIONER BIGGERS:**  Okay, at

7  this point, Mr. Boone, you have the opportunity

8  to make a closing statement.  And if you would

9  please, sir, in your closing statement I would

10 like for you to also tell us why you feel you

11 are suitable for parole.

12     **INMATE BOONE:**  Can I say something in

13 what the district attorney just said?

14     **PRESIDING COMMISSIONER BIGGERS:**  You can

15 do it in your closing statement, sir.

16     **INMATE BOONE:**  Okay.  My actions in

17 committing my crime affected the lives of many

18 people and it took away my wife's life.  She

19 didn't deserve to die.  She has missed out on

20 seeing our daughter Heather grow up and now will

21 never have the chance to see our granddaughter,

22 Aja (phonetic).  I know she would have loved

23 being a grandmother.  When our granddaughter was

24 born I wish my wife could have been there.  It

25 would have meant so much to Heather for her mom

26 to be there when that event happened.  But my

27 actions didn't allow that to happen and for that

91

1   I feel a great deal of remorse for my wife and

2   the remorse I feel will be with me for the rest

3   of my life.  My daughter Heather has suffered

4   with the loss of her mother, with me killing her

5   mother and with me being incarcerated.  It is

6   not something that a seven year old little girl

7   should have to deal with.  Heather had some

8   problems along the way that I know were a result

9   of what I did, and the fact that neither of her

10  parents were there for her.  My wife and

11  daughter meant the world to me and I love them

12  very much.  I am truly sorry for what I did.  I

13  take full responsibility for what I did and

14  there were no excuses.  I was wrong.  I didn't

15  have insight into what happened.  I didn't think

16  how it would change everything forever.  It was

17  my choice, certainly the wrong choice, but I

18  take full responsibility for my actions.  The

19  therapy groups and self-help groups as well as

20  the one-on-one sessions over many years have

21  given me the chance to see there are many ways

22  to deal with stressful situations and not act

23  out in a violent manner.  In my case I could

24  have walked out that night, I could have stayed

25  away, I could have seen a marriage counselor for

26  advice on what I could do.  At the time I didn't

27  realize what could have happened and I lacked

1   the insight needed to prevent this crime from
2   happening in the first place. As they say,
3   hindsight is 20/20. With the knowledge I have
4   now through therapy I had I will never commit a
5   crime again if released. My wife's other
6   children, Helen, Tricia and Linda (phonetic)
7   were also devastated with the death of their
8   mother. I have known them since they were ten,
9   nine and seven. They spent a lot of time with
10  us over the years and I love them like my
11  daughter Heather. The remorse I feel for them
12  is as great as ever and I hope one day I can see
13  them again. I believe I am suitable for parole
14  and not an unreasonable threat or an
15  unreasonable risk of danger to society or a
16  threat to public safety and my psych reports
17  endorse my release from prison. Plus I was
18  suitable in the past. I have parole plans for
19  the state of California and I have parole plans
20  for New Jersey, where I also have family support
21  and support from friends I grew up with. I have
22  participated sufficiently in therapy groups and
23  self-help groups that have helped me over a 20
24  year period deal with the stressful daily living
25  of a prison environment. It will continue to
26  help me upon my release. The vocational
27  training I received over the two decades I have

93

1  been in prison will also enhance my ability to

2  secure a truck driving job due to the fact I can

3  perform the maintenance on the tractor required

4  to keep me on the road.  I am not criminally

5  minded and I have no record of criminal history

6  prior to my commitment offense.

7          **DEPUTY COMMISSIONER MORRIS:**  I need you

8  to stop right there.

9          **INMATE BOONE:**  Okay.

10         **DEPUTY COMMISSIONER MORRIS:**  I'll turn

11 the tape.

12               (The tape was turned over.)

13         **DEPUTY COMMISSIONER MORRIS:**  Okay, we're

14 back on record.  Please continue.

15         **INMATE BOONE:**  Okay.  I lived the life of

16 a good parent to my daughter Heather and I was a

17 good husband to my wife Velvet.  I was a patriot

18 to my country and served honorably for 14 years

19 in the United States Marine Corps.  I am still

20 that person and I would serve again if asked.  I

21 have a stable social history and made

22 friendships with people even while incarcerated

23 and maintained those prior to incarceration.  I

24 am 52 years old and I want nothing more than to

25 leave here and be back with my family and

26 friends and get a job and not be a burden to any

27 state or anyone.  The relationship with my

94

1  daughter means the most to me.  I haven't seen
2  her in person for 15 years.  It is my intention
3  to help her as much as I can and try to repair
4  the damage I have done.  I am also very excited
5  to meet my granddaughter for the first time.
6  She will be eight years old in 15 days.  I don't
7  have a juvenile record of any kind.  I have
8  marketable skills that can be put to use upon my
9  release as well as realistic parole plans.  My
10 commitment offense was committed as a result of
11 significant marital stress.  I accept full
12 responsibility for my action and I can say
13 without a doubt I will never use an act of
14 violence against anyone.  My institutional
15 behavior has been exemplary with the exception
16 of a CDC 115 over a 20 year period.  In
17 receiving the 115 I avoided what I knew would be
18 a violent confrontation with skinheads in the
19 north dorm.  I feel I practiced and demonstrated
20 positive change and used an alternative to
21 violence by avoiding a fight.  I sit before you
22 with two decades of prison life and not one
23 single act of violence throughout my
24 incarceration.  That is a feat not many inmates
25 can claim.  I have no doubt when I am released I
26 will do well wherever I have to parole to.  But
27 it is my hopes and dreams that I can return to

95

1    New Jersey as quickly as possible and be

2    reunited with my family and friends.  In closing

3    I would like to say once again that I am very

4    remorseful for killing my wife and taking her

5    away from my daughter.  My wife did not deserve

6    to die for her actions and I will feel this way

7    for the rest of my life.  I did love my wife

8    very much and we had some good times over the

9    years and that is what I try to focus on.  I am

10   sorry she is unable to ever experience life,

11   love and live again and I am sorry for taking

12   her life.  It is my hope that the Board will

13   find me suitable, let me go home and let my

14   daughter have her father back in her life.  You

15   said I could in the closing make a remark about

16   what the district attorney said.

17          **PRESIDING COMMISSIONER BIGGERS:**  Yes you

18   can.

19          **INMATE BOONE:**  Every parole hearing that

20   I have come to I have been honest in every way

21   that I can -- I have never lied, not one time

22   coming to a parole hearing, and that's what she

23   is basically accusing me of here today.  Never

24   once have I lied at a parole hearing.  And I

25   pretty much take offense to being called a liar

26   when I haven't, when I haven't done that.

27          **PRESIDING COMMISSIONER BIGGERS:**  Talk to

96

1  us, don't talk to the district attorney.

2          **INMATE BOONE:**  And I take offense for

3  that sir.  I think that's very inappropriate and

4  I am just voicing my concern over that.  The

5  fact that I have been truthful at each and every

6  parole hearing and I try my best to try to

7  explain myself to the best of my ability.

8          **PRESIDING COMMISSIONER BIGGERS:**  That's

9  noted.  Are you finished sir?

10          **INMATE BOONE:**  I guess that's about it.

11          **PRESIDING COMMISSIONER BIGGERS:**  Okay,

12  we'll go into deliberations at this point.

13                    **R E C E S S**

14                    --oOo--

15

16

17

18

19

20

21

22

23

24

25

26

27

1          **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3          **DEPUTY COMMISSIONER MORRIS:**    Okay, we are

4     back on record.

5          **PRESIDING COMMISSIONER BIGGERS:**    Okay.

6     Let the record reflect that everyone that was in

7     the room prior when we went in for deliberations

8     are now back in the room.    In the matter of

9     Mr. Donald Boone, CDC number D-37952 the panel

10    has reviewed all information received from the

11    public and relied on the following circumstances

12    in concluding that the prisoner is suitable for

13    parole and would not pose an unreasonable risk

14    of danger to society or a threat to public

15    safety if released from prison.    Mr. Boone, we

16    looked at a lot of things.    You have been

17    incarcerated for 20 years, one year for the

18    enhancement that you had with the weapon and 19

19    years for the crime of murder in the second

20    degree.    The factors that we looked at included

21    the fact that you had no juvenile record or

22    record of assaulting others.    You came from a

23    stable social history as exhibited by reasonable

24    and stable, your relationship with others.    And

25    while in prison you have -- although you have

26    had one 115, and we'll talk about that a little

27    **DONALD BOONE    D-37952    DECISION PAGE 1    08/10/06**

98

1   bit later on, you have worked well within the

2   institution.  You have gotten three vocations,

3   vocational programs.  And I need to get that

4   sheet from you there, Mr. Morris.  You have, you

5   have three vocations since you have been

6   incarcerated, one in small engine repair, the

7   other one in office machinery and another one in

8   auto repair with the National Institute of

9   Automotive.  And you also have some certificates

10  in that as well.  And you have also got some

11  achievement in welding.  You are currently

12  working in PIA landscaping and you got

13  exceptional reports in that regard.  So you have

14  been doing a lot of things in institutional job

15  assignments.  We also noted that you lack a

16  significant criminal history of violent crimes.

17  We also feel that with your age right now,

18  you're 52 years old, that your chance for

19  recidivism is probably extremely low at this

20  point.  Now in regards to your parole plans.  I

21  got on the phone and I called the interstate

22  people and we do have a packet with New Jersey.

23  In fact we have them with every state in the

24  union at this point.  So while this is going up

25  through the review process then you should

26  already today, or no later than tomorrow, start

27  **DONALD BOONE   D-37952   DECISION PAGE 2   08/10/06**

99

1    the paperwork to see if you will, if New Jersey

2    will accept the parole supervision of you.

3              **INMATE BOONE:**  Yes sir.

4              **PRESIDING COMMISSIONER BIGGERS:**  So you

5    do have realistic plans in New Jersey.  And as I

6    said before, you need to start doing the

7    paperwork right now and ask them if they will

8    take you.  One of the things we looked at really

9    strongly were your signs of remorse.  We got the

10   impact that you really understand the nature and

11   the magnitude of the crime that you committed

12   and the acceptance of responsibility for the

13   criminal behavior and you have a desire to

14   change.  And I don't know if that change is

15   primarily because of our daughter or that you

16   realize the fact that there could have been

17   other ways of doing that.  And when I asked you

18   about that you were pretty open that there were

19   certainly other things that you could have done

20   to change that.

21             **INMATE BOONE:**  Yes sir.

22             **PRESIDING COMMISSIONER BIGGERS:**  We also

23   discussed your psychological reports, not only

24   from Dr. Stack dated 11/05/04 where he said that

25   you were a very good candidate for parole

26   consideration.  Then I went back to 2000 and

27   **DONALD BOONE   D-37952   DECISION PAGE 3   08/10/06**

100

1    Dr. Terrini, T-E-R-R-I-N-I, also said that you

2    were a good candidate for parole. And I want to

3    read a couple of things into the record that,

4    starting with Dr. Stack. He indicated that the

5    115 that you got was not for any violent

6    behavior but was his attempt to avoid a violent

7    confrontation with an inmate living in the

8    dormitory. He also indicated that you have a

9    lack of criminal history, a lack of any 115 for

10    violent behavior and also complete absence of a

11    CDC 128 for any violence, aggressive or defiant

12    behavior. If released to the community his

13    violence potential is estimated to be no more

14    than the average citizen in the community. This

15    assessment echoes the conclusions of Dr. Terrini

16    in his 2000 Board Report. The inmate does not

17    have a mental health disorder that would

18    necessitate treatment either during his

19    incarceration or following upon his parole. He

20    does not have a significant drug or alcohol

21    problem. And that is one of the reasons why we,

22    we looked at that to make sure that you have not

23    had any problems with drugs or alcohol that

24    could have contributed to this commitment

25    offense. In the 2000 report it indicated that,

26    he mentioned that, and this is from Dr. Terrini,

27    **DONALD BOONE    D-37952    DECISION PAGE 4   08/10/06**

1  T-E-R-R-I-N-I.  He also talked about you not

2  having a significant drug or alcohol problem.

3  If released to the community his violence

4  potential is estimated to be no more than the

5  average citizen.  There is no significant risk

6  factor for this inmate which would be a

7  precursor for violence for this man.  One of his

8  counselors wrote in a report that he wondered if

9  this inmate had the ability to have a healthy

10  marriage.  I believe he does have that ability

11  as he understands there is no action by a wife

12  that would ever justify the crime he committed.

13        **INMATE BOONE:**  Yes sir.

14        **PRESIDING COMMISSIONER BIGGERS:**  Saying

15  all that, and then plus I went back and I looked

16  at what Commissioner Lee wrote in  his report as

17  well when he said that he felt that this was a

18  one time occurrence and that you acted

19  irrationally.  Seeing all that, Mr. Boone, this

20  panel feels that you are in fact suitable for

21  parole.  And in going through the matrix we went

22  and we used the matrix of 2(b), which was

23  because there was a prior relationship, you were

24  involved in a personal relationship, she was

25  your spouse.  B, there was a direct or victim

26  contribution.  Death was almost immediate or

27  **DONALD BOONE   D-37952   DECISION PAGE 5   08/10/06**

102

1  resulted at least partially from the

2  contributing factor in that you shot her there.

3       **INMATE BOONE:**  Yes sir.

4       **PRESIDING COMMISSIONER BIGGERS:**  And we

5  came up with a base term.  The base offense for

6  the murder, for the prisoner being convicted of

7  on March the 2nd and that was in 1986.

8       **INMATE BOONE:**  May 3rd, sir.

9       **DEPUTY DISTRICT ATTORNEY DAWSON:**  May

10  3rd.

11       **PRESIDING COMMISSIONER BIGGERS:**  I'm

12  sorry, what was that?

13       **DEPUTY DISTRICT ATTORNEY DAWSON:**  May

14  3rd.

15       **PRESIDING COMMISSIONER BIGGERS:**  May 3rd

16  of, yeah it was -- The incident took place on

17  April 18, 1986.  The offense occurred on April

18  18, 1986 and you were convicted on -- what date

19  was that conviction on, excuse me?  Go to the

20  legal.  You were convicted on --

21       **DEPUTY DISTRICT ATTORNEY DAWSON:**  He shot

22  her on May 3, 1986.  There was --

23       **PRESIDING COMMISSIONER BIGGERS:**  Okay,

24  okay.  I'm sorry.

25       **DEPUTY DISTRICT ATTORNEY DAWSON:**  There

26  was a restraining order in April.

27  **DONALD BOONE   D-37952   DECISION PAGE 6   08/10/06**

103

1      **PRESIDING COMMISSIONER BIGGERS:**  Okay,

2  I'm sorry, that was my mistake.  The offense

3  occurred May the 3rd?

4      **DEPUTY DISTRICT ATTORNEY DAWSON:**  May the

5  3rd, 1986.

6      **PRESIDING COMMISSIONER BIGGERS:**  1986.

7  And he was convicted on?

8      **DEPUTY DISTRICT ATTORNEY DAWSON:**  August

9  22, 1986.

10      **PRESIDING COMMISSIONER BIGGERS:**  August

11  1986, right?

12      **DEPUTY DISTRICT ATTORNEY DAWSON:**  Yes.

13      **DEPUTY COMMISSIONER MORRIS:**  8/22/86.

14      **PRESIDING COMMISSIONER BIGGERS:**  August

15  the 22nd, 1986.  And I'm going to have to change

16  something on the sheet there.  But I can do that

17  here very shortly before I give you your sheet.

18      **INMATE BOONE:**  Yes sir.

19      **PRESIDING COMMISSIONER BIGGERS:**  Anyway,

20  the base term for which the prisoner has been

21  convicted of is August the 22nd, 1986 and it was

22  a violation of a PC 187 second degree.  The

23  offense occurred on May the 3rd, 1986.  The

24  panel is going to assess 228 months for the base

25  offense and that was taken from the matrix.  We

26  used 2(b), prior relationship as well as direct

27  **DONALD BOONE   D-37952   DECISION PAGE 7   08/10/06**

104

1    or the victim's contribution.  And we used the

2    middle term, which was 18 years.  We looked at

3    the aggravation in that you had a special

4    relationship of confidence and trust with the

5    victim because it was your spouse.  In

6    mitigation we noticed that the crime was

7    committed during an unusual situation unlikely

8    to reoccur.  And this took place -- And reading

9    that from the psychological reports.  They all

10   indicated that this seemed like it just was a

11   one time thing.

12          **INMATE BOONE:**  Yes sir.

13          **PRESIDING COMMISSIONER BIGGERS:**  The

14   crime was committed during a brief period of

15   extreme mental and emotional trauma.  The panel

16   took into consideration you were just returning

17   back from a 12 month deployment overseas.  You

18   walk into the house ten days earlier and your

19   wife is in the arms of another man in her

20   housecoat.  And the fact that you had minimal or

21   no history of criminal behavior.  We also note

22   that the district attorney of San Bernardino

23   County notes her opposition to a finding of

24   parole suitability.  The calculations, and this

25   is going to be recalculated again when it goes

26   up to the headquarters but I am going to just

27   **DONALD BOONE   D-37952   DECISION PAGE 8   08/10/06**

105

1   check it one more time to make sure that I did

2   the right thing. We go to the base term and the

3   base term was 228 months. And there was an

4   adjustment for the weapon because there was

5   personal use of a firearm, which was a violation

6   of 12022.5. And according to the chart that I

7   am using I take half of the -- it's a 24 month

8   adjustment. But I have to take half of that

9   because the crime occurred before 1/1, before

10  January the 1st, 1990. So half of the 24 months

11  would give you 12 months for an adjustment for

12  the weapon for a total of 240 months. For post-

13  conviction credits. You get four months for

14  each year that you don't have a 115.

15          INMATE BOONE:  Yes sir.

16          PRESIDING COMMISSIONER BIGGERS:  So you

17  have four months and we gave you a period of 19

18  years because we had to take -- well it's 18

19  years now because we had to take one year away

20  from the year that you had the 115. So we're

21  looking at I believe it's 18 years times 4 and

22  that gives you 72 months. So if you take 72

23  months from the 240 you come up with 168 months.

24  So that's the total period of confinement that

25  you have.

26          INMATE BOONE:  Yes sir.

27  DONALD BOONE   D-37952   DECISION PAGE 9   08/10/06

- - 106

1        **PRESIDING COMMISSIONER BIGGERS:**  Now the

2   special conditions of your parole are going to

3   be, do not use alcoholic beverages, submit to

4   alcohol testing.  You will not actively

5   participate or promote -- well let me back up.

6   You have never been involved with alcohol.

7   However, it is a general condition that you have

8   to submit to whatever your parole agent tells

9   you.

10       **INMATE BOONE:**  Yes sir.

11       **PRESIDING COMMISSIONER BIGGERS:**  I am not

12  going to say that -- You don't seem to have a

13  history of alcoholic or beverages or narcotics

14  so I am not going to really put a special

15  condition of that on you.

16       **INMATE BOONE:**  Okay.

17       **PRESIDING COMMISSIONER BIGGERS:**  But if

18  your parole agent says that he feels that it is

19  necessary he can do that.

20       **INMATE BOONE:**  Yes sir.

21       **DEPUTY COMMISSIONER MORRIS:**  (Inaudible).

22       **PRESIDING COMMISSIONER BIGGERS:**  The big

23  thing -- And I don't know of any other special

24  conditions that I want to hand down.  Do you

25  have any that you want to recommend?

26       **DEPUTY COMMISSIONER MORRIS:**  No.

27  **DONALD BOONE   D-37952 DECISION PAGE 10   08/10/06**

107

1     **PRESIDING COMMISSIONER BIGGERS:**  So

2     anyway sir, you have done well.  We hope the

3     best for you.

4     **INMATE BOONE:**  Thank you.

5     **PRESIDING COMMISSIONER BIGGERS:**  Now keep

6     in mind that this is not final.

7     **INMATE BOONE:**  Yes sir.

8     **PRESIDING COMMISSIONER BIGGERS:**  It has

9     to go before what we consider our Decision

10    Review as well as go up to the Governor for a

11    date.

12    **INMATE BOONE:**  Yes sir.

13    **PRESIDING COMMISSIONER BIGGERS:**  In the

14    meantime you should continue to be going on the

15    route that you're going.  You shouldn't get

16    argumentative with anybody.  You should continue

17    to go down this path.  And hopefully as it goes

18    up the chain they will see that you have

19    rehabilitated yourself.

20    **INMATE BOONE:**  Yes sir.

21    **PRESIDING COMMISSIONER BIGGERS:**  You want

22    to add anything to it?

23    **DEPUTY COMMISSIONER MORRIS:**  I need to

24    tell you that I had a real hard time with the

25    2002 115.

26    **INMATE BOONE:**  Yes sir.

27    **DONALD BOONE   D-37952 DECISION PAGE 11   08/10/06**

108

1          **DEPUTY COMMISSIONER MORRIS:**  That's just

2    a little close to a parole date for me.  The

3    mitigation was, I believe you when you say it

4    was a lock-up move.  And because I accepted

5    that, that still cost you some time, even in the

6    calculations.

7          **INMATE BOONE:**  Yes sir.

8          **DEPUTY COMMISSIONER MORRIS:**  I had a

9    difficult time with that.  So what you don't

10   want to do is get into any kind of a

11   situation --

12         **INMATE BOONE:**  No sir.

13         **DEPUTY COMMISSIONER MORRIS:**  -- where you

14   do not yield to the direction of staff.

15         **INMATE BOONE:**  Yes sir.

16         **DEPUTY COMMISSIONER MORRIS:**  If they tell

17   you to pick up a 500 pound rock just get it,

18   file your appeal.

19         **INMATE BOONE:**  Yes sir.

20         **DEPUTY COMMISSIONER MORRIS:**  Okay?

21         **INMATE BOONE:**  Yes sir.

22         **DEPUTY COMMISSIONER MORRIS:**  Do not be a

23   management problem at all.

24         **INMATE BOONE:**  No sir.

25         **PRESIDING COMMISSIONER BIGGERS:**  I did it

26   correctly so it's good to go.  Good luck to you

27   **DONALD BOONE  D-37952 DECISION PAGE 12  08/10/06**

109

1  sir.

2         **INMATE BOONE:**  Thank you and I appreciate

3  it very much.

4         **DEPUTY COMMISSIONER MORRIS:**  It's not

5  over.

6         **INMATE BOONE:**  Yes sir, I know.

7         **DEPUTY COMMISSIONER MORRIS:**  It's a

8  recommendation.

9                    --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23  **PAROLE GRANTED**

24  **THIS DECISION WILL BE FINAL ON:** December 8, 2006.

25  **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **DONALD BOONE   D-37952 DECISION PAGE 13   08/10/06**

110

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, RAMONA COTA, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 109, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of DONALD BOONE, CDC NO. D-37952, on AUGUST 10, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated August 28, 2006, at Sacramento County, California.

RAMONA COTA
TRANSCRIBER
**PETERS SHORTHAND REPORTING**